## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| David G. Feinberg (Tampa, Florida), Regina Widderich (Reisterstown, Maryland), Jitesh Jani (Clearwater, Florida), Sital Jani (Clearwater, Florida), James Collins (Manchester, Maryland), Farrah Qureshi (Colorado Springs, Colorado), Daniel Newman (Colorado Springs, Colorado), Maria Stanton (Nottingham, Maryland), Daniel Fialkoff (Baltimore, Maryland), Michelle Bourque (Towson, Maryland), and Thomas Henry (Baltimore, Maryland), on behalf of themselves, individually and on behalf of all others similarly situated, | Civil Action File No.: 1:17-cv-427 **FIRST AMENDED CLASS ACTION COMPLAINT** |

                    Plaintiffs,

v.

T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., T. Rowe Price Trust Company, T. Rowe Price Group, Inc. Management Committee, T. Rowe Price Group, Inc. Management Compensation Committee, Christopher D. Alderson, Edward C. Bernard, Michael C. Gitlin, James A. C. Kennedy, John D. Linehan, Brian C. Rogers, William J. Stromberg, Eric L. Veiel, Edward A. Wiese, T. Rowe Price U.S. Retirement Program Trustee Does 1-40, and Does 1-30,
    c/o T. Rowe Price Group Inc.
    100 East Pratt Street
    Baltimore County
    Baltimore, MD 21202

                    Defendants.

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...........................................................................................1

II.    JURISDICTION AND VENUE ....................................................................................6

III.    PARTIES .......................................................................................................................6

      A.    Plaintiffs` ...........................................................................................................6

      B.    Defendants .......................................................................................................11

IV.    FACTUAL BACKGROUND ........................................................................................14

      A.    The 401(K) Plan, its Fiduciaries, and its Investments ...........................................14

      B.    Defendants Retained High Cost Proprietary Funds in the Plan in their Own Self-Interest and at the Expense of Plaintiffs and the other Plan Participants.......................................16

      C.    Defendants Failed to Procure the Least Expensive Available Share Class of Numerous Funds .......................................................................................................23

      D.    Defendants Failed to Adequately Monitor Plan Investments and Remove Poorly Performing Investments ...............................................................................................36

      E.    Defendants Used the Retirement Assets of T. Rowe Price Employees to Seed New Investment Vehicles .................................................................................................41

      F.    Defendants Breached Their Fiduciary Duties of Prudence and Loyalty and Committed Transactions Prohibited by ERISA.......................................................43

          1.    401(k) Plan Trustees Failed to Correct the Breaches of Predecessor Fiduciaries .................................................................................................43

          2.    The Trustees' Imprudent and Disloyal Selection of 401(k) Plan Investment Options.............................................................................................. 44

          3.    The Trustees' Imprudent and Disloyal Investment Monitoring ...............45

          4.    The Defendant T. Rowe Price Investment Affiliates' Fiduciary Breaches45

          5.    The Appointing Fiduciary Defendants' Fiduciary Breaches ....................46

          6.    Defendants' Violations of ERISA's Prohibited Transaction Provisions ...46

      7.     Other Facts Relevant to Defendants' Breaches ..........................................46

V.      CLASS ACTION ALLEGATIONS ..............................................................................477

VI.     CLAIMS FOR RELIEF ......................................................................................50

COUNT I
Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring and
Selection of 401(k) Plan Investments during the Class Period, which Caused Losses to
the 401(k) Plan(Violation of ERIA, 29 U.S.C. §1104 by the 401(k) Plan Trustees) ........50

COUNT II
The Appointing Fiduciary Defendants Breached their ERISA Fiduciary Duties by Failing
to Remove and Prudently Monitor the 401(k) Plan Trustees ............................................51

COUNT III
Breach of Duties of Loyalty and Prudence by Providing Imprudent and Self-Interested
Investment Advice to Committee Defendants (Violation of ERISA, 29 U.S.C. §1104 by
Defendant T. Rowe Price Investment Affiliates)...............................................................52

COUNT IV
Liability for Breach of Co-Fiduciary
(Liability Pursuant to ERISA, 29 U.S.C. §1105 of the Appointing Fiduciary Defendants
and the T. Rowe Price Investment Affiliates)....................................................................53

COUNT V
Liability for Failing to Remedy Breach of Predecessor Fiduciaries
(ERISA Violation Against the 401(k) Plan Trustees)........................................................54

COUNT VI
Liability for Committing Prohibited Transactions
in Violation of ERISA, 29 U.S.C. §1106 (Against the 401(k) Plan Trustees and the T.
Rowe Price Investment Affiliates)....................................................................................55

COUNT VII
Other Equitable Relief Based on Ill-Gotten Proceeds
In Violation of ERISA, 29 U.S.C. § 1132(a)(3
(Against T. Rowe Price and T. Rowe Price Investment Affiliates)...................................57

# I.  NATURE OF THE ACTION

1.      This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), for violations of ERISA's fiduciary duty and prohibited transaction provisions.  It is brought as a class action by David G. Feinberg, Regina Widderich, James Collins, Jitesh Jani, Sital Jani, Farrah Qureshi, Daniel Newman, Maria Stanton, Daniel Fialkoff, Michelle Bourque and Thomas Henry,  participants in the T. Rowe Price U.S. Retirement Program ("401(k) Plan" or "Plan"), a defined contribution 401(k) Plan, on behalf of the 401(k) Plan and all similarly situated Plan participants and beneficiaries (henceforth, collectively, "participants"), and all predecessor plans.

2.      This suit is about corporate self-dealing at the expense of the retirement savings of company employees.  Defendants are all fiduciaries of the 401(k) Plan who are required by ERISA to act prudently and solely in the interest of the Plan's participants when making decisions with respect to 401(k) Plan investments.

3.      Defendants, rather than fulfilling their ERISA fiduciary duties ("the highest known to law"[1]), favored the economic interests of T. Rowe Price Group, Inc. ("T. Rowe Price" or the "company") and its affiliates over the interests of their employees in saving for their retirement.  Defendants did so by offering, during the Class Period (February 14, 2011 through judgment in this case), only T. Rowe Price's own in-house investment funds in its 401(k) Plan. This exclusive relationship provided a windfall to two T. Rowe Price affiliates: T. Rowe Price Associates, Inc. ("T. Rowe Price Associates") and T. Rowe Price Trust Company ("T. Rowe Price Trust"; collectively these entities are the "T. Rowe Price Investment Affiliates").  The

---

[1] Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc., 793 F.2d 1456, 1468 (5th Cir.1986) (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n. 8 (2d Cir.1982)).

1

Defendant T. Rowe Price Investment Affiliates serve as the investment advisor for those funds and collect the fees charged to investors in those funds.

4.      T. Rowe Price's asset management business is remarkably profitable.  During the Class Period, its annual profit margin reached a noteworthy 30.9%.  In contrast, one of the most profitable large tech companies, Apple, Inc., had an average profit margin of 21.7% during this period.

5.      T. Rowe Price's stock has been one of the best performing in the S&P 500 index over the last 25 years.  Its value increased 7,668%, virtually the same as the 7,682% increase in the price of Apple, Inc.'s stock.  This reflects a rule among finance professionals that if an investor really wants to earn big money in mutual funds, they should invest in the stocks of mutual fund companies, rather than the funds themselves.

6.      Offering only its own in-house funds in its 401(k) Plan earned T. Rowe Price and its affiliates windfall profits.  This was because of the enormous profitability of T. Rowe Price's asset management business, and because virtually no additional expenditure or overhead was required to offer its own funds in its own plan.  These profits came at the expense of the retirement savings of T. Rowe Price employees.

7.      Defendants did not, as required by ERISA, select or retain the in-house funds in the 401(k) Plan as a result of a prudent or loyal process that considered non-proprietary alternatives and whether those alternatives might better serve Plan participants in terms of lower cost and better performance.  Instead, because of the financial benefit to T. Rowe Price, Defendants simply chose and retained their in-house funds for the 401(k) Plan because of the financial benefit to the company.

2

8.      Defendants also failed to loyally and prudently monitor the fees and performance of 401(k) Plan investment options.  Instead, they simply retained the in-house funds to enrich T. Rowe Price.

9.      It is axiomatic in the financial services industry that no single company is the best at managing every asset class or type of investment fund; particular companies have their strengths and their weaknesses.  Despite this, Defendants refused to consider offering better funds from other companies in the 401(k) Plan.

10.      Notwithstanding the availability of cheaper and better performing non-proprietary investments, and further motivated by the financial benefit to T. Rowe Price, Defendants did not even select and retain the least expensive identical versions of many of the proprietary investments included in the 401(k) Plan.  Defendants frequently offered the higher cost retail class versions of T. Rowe Price mutual funds in the T. Rowe Price 401(k) Plan.  They did so despite the fact that significantly less expensive versions of these funds were available, including institutional share classes, Collective Investment Trusts, and Separately Managed Accounts.[2] These were managed in the same way by the same persons as the higher cost versions but are lower cost because they are only offered to higher net worth investors, such as retirement plans.

---

[2] A "**retail class**" version of a mutual fund is a share class designed to be offered for sale to the average individual investor, who will not be investing the millions of dollars that the T. Rowe Price plan would be investing.  A "**Collective Investment Trust**" refers to an investment vehicle, other than a mutual fund governed by the Investment Company Act of 1940, that is offered for investment to more than one investor.  Such funds are typically offered by financial institutions such as banks, are usually less expensive than mutual funds, and are only available to high net worth investors such as institutional investors, including retirement plans.  A "**Separately Managed Account**" refers to a professionally managed investment account managed by a professional investment manager to a single investor.  The investor typically directly owns the securities and other assets in the account.

Offering higher cost versions to Plan participants enriched T. Rowe Price and its subsidiaries at participants' expense.

11.     In those instances when less expensive alternatives to certain retail class mutual funds did not exist, Defendants could have used the fact that the 401(k) Plan was a large institutional investor as leverage in negotiations to create cheaper alternatives.  For example, third-party mutual fund providers like Voya Financial (formerly known as ING) sponsored institutional mutual funds advised by T. Rowe Price that were cheaper than the retail options offered to the Plan. As explained *infra*, ¶¶ 64-67, these third-party funds were materially identical to T. Rowe Price's retail offering in all respects but cost. T. Rowe Price advised these third-party clients and their funds through sub-advisory relationships[3]. In this sub-adviser role, T. Rowe Price agreed to advise these third-party clients for a substantially lower fee than what the Plan paid for the same exact services. In failing to take these steps for the benefit of employees, Defendants enriched T. Rowe Price and its subsidiaries at the expense of Plan participants.

12.     Defendants also enriched themselves by offering to 401(k) Plan participants Collective Investment Trusts, a more expensive version of the other type of investment vehicle in the Plan (i.e. apart from mutual funds) during the latter part of the Class Period.  As discussed further below, they offered more expensive classes of these trusts to 401(k) Plan participants than they made available to their commercial customers.

13.     As a result of Defendants' fiduciary breaches and prohibited transactions, T. Rowe Price 401(k) Plan participants were deprived of millions of dollars in retirement plan returns that they would have earned if Defendants had selected investment funds without limiting

---

[3] A sub-advisor is a money manager who works outside of the fund, and is hired by a fund manager to manage a fund's assets.

their choices to those offered by Defendants.  For example, as discussed further below, if funds from other established investment companies, such as Vanguard Investments, had been used instead, T. Rowe Price 401(k) Plan participants would have paid Defendants at least **$27 million less** **in fees** during the Class Period.  If better investment funds had been offered in the T. Rowe Price 401(k) Plan rather than T. Rowe Price investment funds in which T. Rowe Price performance was weak, participants would have earned over **$123 million** *more*.  And since Plaintiffs currently lack full performance information for several of the T. Rowe Price funds offered, the latter figure may increase materially once that information is obtained.

14.     The class is all participants in the 401(k) Plan (and their beneficiaries) from February 14, 2011 to the time of judgment ("Class Period").

15.     Plaintiffs seek relief including disgorgement of all investment advisory fees paid to T. Rowe Price and/or its subsidiaries from 401(k) Plan assets, as well as the difference in performance between readily available and better performing non-proprietary funds that could have been offered in the 401(k) Plan.  During the Class Period, 401(k) Plan participants paid T. Rowe Price Associates in excess of **$50 million in fees**.

16.     The allegations in this amended complaint are based upon Plaintiffs' counsel's investigation of public documents, including filings with the U.S. Department of Labor and the U.S. Securities and Exchange Commission, investment fund prospectuses and certain other documents provided to Plaintiffs because of their status as Plan participants.  Allegations regarding Defendants' conduct are made on information and belief as internal documents relating to decision-making are not available to the public or participants at this stage of this litigation.[4]

---

[4] For example, Plaintiffs do not have any minutes of any group or committee of Defendants charged with selecting investment funds to offer in the Plan and thereafter monitoring the

As many facts remain in Defendants' exclusive possession, Plaintiffs may make further changes to his claims after discovery.

## II.   JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1).

18.     Venue is proper in this district pursuant to ERISA, 29 U.S.C. §1132(e)(2) because many of the breaches complained of occurred in this District, the Plan is administered in this District, one or more Plaintiffs reside in this District, and one or more of the Defendants reside or may be found in this District.

## III.   PARTIES

### A.  Plaintiffs

19.     **Plaintiff David G. Feinberg**.  Plaintiff Feinberg is a resident of Tampa, Florida and is a participant in the Plan.  He worked for T. Rowe Price out of their Florida office for 16 years as a technical support specialist for T. Rowe Price's international offices.  From 1995 to the present, Feinberg has been invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified herein.  Feinberg has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Feinberg's Plan investments.

20.     **Plaintiff Regina Widderich**.  Plaintiff Regina Widderich is a resident of Reisterstown, Maryland and is a participant in the Plan.  She has been an employee at T. Rowe

---

performance of the investment funds chosen.  These minutes are not available under ERISA to participants.

Price in the Owings Mills, Maryland office since 1997 as a retail account manager.  From 1997

to the present, Widderich has been invested in several different funds offered within the Plan,

including several of the examples of imprudently selected, monitored and retained investments

identified below.  Widderich has suffered financial harm and has been injured by Defendants'

unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have

been unjustly enriched from the various fees and expenses generated as a result of Widderich's

Plan investments.

21.     **Plaintiff Jitesh Jani**.  Plaintiff Jitesh Jani is a resident of Clearwater, Florida and

is a participant in the Plan.  He worked at T. Rowe Price in the Tampa, Florida office from 2000

to 2009 in various positions.  From 2000 to the present, Jitesh Jani has been invested in several

different funds offered within the Plan, including several of the examples of imprudently

selected, monitored and retained investments identified herein.  Jitesh Jani has suffered financial

harm and has been injured by Defendants' unlawful conduct as described in this Amended

Complaint.  Furthermore, T. Rowe Price and its subsidiaries have been unjustly enriched from

the various fees and expenses generated as a result of Jitesh Jani's Plan investments.

22.     **Plaintiff Sital Jani**.  Plaintiff Sital Jani is a resident of Clearwater, Florida and is

a participant in the Plan.  She worked in T. Rowe Price's Tampa, Florida office from 2002 to

2010 as a participant service representative and in retail account management.  From 2002 to the

present, Sital Jani has been invested in several different funds offered within the Plan, including

several of the examples of imprudently selected, monitored and retained investments discussed

below.  Sital Jani has suffered financial harm and has been injured by Defendants' unlawful

conduct as described herein.  In addition, T. Rowe Price and its subsidiaries have been unjustly

enriched from the various fees and expenses generated as a result of Sital Jani's Plan

7

investments.

23.     **Plaintiff James Collins**.  Plaintiff James Collins is a resident of Manchester, Maryland and is a participant in the Plan.  He worked at T. Rowe Price in the Owings Mills, Maryland office from 2007 to 2009 as a retirement plan coordinator and from 2009 to 2011 as a retirement plan analyst.  Collins is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Collins was invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified in this Amended Complaint.  Collins has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Collins' Plan investments.

24.     **Plaintiff Farrah Qureshi**.  Plaintiff Farrah Qureshi is a resident of Colorado Springs, Colorado and is a participant in the Plan. She worked at T. Rowe Price in the Colorado Springs, Colorado office from September 2012 to March 2014 as a retail investment and brokerage trading associate.  Qureshi is entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described below. She was invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified herein.  Qureshi has suffered financial harm and has been injured by Defendants' unlawful conduct as described in this Amended Complaint.  Furthermore, T. Rowe Price and its

subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Qureshi's Plan investments.

25.     **Plaintiff Daniel Newman**.  Plaintiff Daniel Newman is a resident of Colorado Springs, Colorado and is a participant in the Plan.  He worked in T. Rowe Price's Colorado Springs, Colorado office from October 2006 to January 2012 in various participant service representative positions.  Newman is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein.  Newman had been invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified herein.  Newman has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Additionally, T. Rowe Price and its subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Newman's Plan investments.

26.     **Plaintiff Maria Stanton**.  Plaintiff Maria Stanton is a resident of Nottingham, Maryland and is a participant in the Plan.  She worked at T. Rowe Price in the Owings Mills, Maryland office from October 1997 to August 2007 as a senior business systems analyst, and again from August 2010 to April 2011 as a solutions consultant.  Stanton is entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described herein.  Stanton was invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified herein.  Stanton has suffered financial harm and

9

has been injured by Defendants' unlawful conduct as described herein.  Furthermore, T. Rowe

Price and its subsidiaries have been unjustly enriched from the various fees and expenses

generated as a result of Stanton's Plan investments.

27.     **Plaintiff Daniel Fialkoff**.  Plaintiff Daniel Fialkoff is a resident of Baltimore,

Maryland and is a participant in the Plan.  He worked for T. Rowe Price out of their Owings

Mills, Maryland office for four years as an investment guidance counselor and financial

institutional representative.  Fialkoff is entitled to receive benefits from the Plan in the amount of

the difference between the value of his account as of the time his account was distributed and

what his account would have been worth at that time had Defendants not violated ERISA as

described herein.  Fialkoff had been invested in several different funds offered within the Plan,

including several of the examples of imprudently selected, monitored and retained investments

identified herein.  Fialkoff has suffered financial harm and has been injured by Defendants'

unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have

been unjustly enriched from the various fees and expenses generated as a result of Fialkoff's

Plan investments.

28.     **Plaintiff Michelle Bourque**.  Plaintiff Michelle Bourque is a resident of Towson,

Maryland and is a participant in the Plan.  She worked at T. Rowe Price in the Baltimore office

from 1993 to 2014 as a legal analyst.  Bourque is entitled to receive benefits from the Plan in the

amount of the difference between the value of her account as of the time her account was

distributed and what her account would have been worth at that time had Defendants not violated

ERISA as described herein.  Bourque was invested in several different funds offered within the

Plan, including several of the examples of imprudently selected, monitored and retained

investments identified herein.  Bourque has suffered financial harm and has been injured by

10

Defendants' unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Bourque's Plan investments.

29.     **Plaintiff Thomas Henry**.  Plaintiff Thomas Henry is a resident of Baltimore, Maryland and was a participant in the Plan from 2011 to 2013.  He worked at T. Rowe Price in the Owings Mills office from April 2007 to June 2008 as a contractor, and from June 2008 to April 2013 as an electronic publishing specialist.  Henry is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein.  Henry had been invested in several different funds offered within the Plan, including several of the examples of imprudently selected, monitored and retained investments identified in this Amended Complaint.  Henry has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, T. Rowe Price and its subsidiaries have been unjustly enriched from the various fees and expenses generated as a result of Henry's Plan investments.

**B.  Defendants**

30.     **Defendant T. Rowe Price Group, Inc. ("T. Rowe Price").**  T. Rowe Price is the sponsor, a fiduciary of the 401(k) Plan, and a party-in-interest to the Plan under 29 U.S.C. § 1002(14). T. Rowe Price is a large mutual fund and financial services organization that provides a broad range of services to consumers and corporate customers.  T. Rowe Price's corporate headquarters are in Baltimore, Maryland.

31.     **Defendant T. Rowe Price Associates, Inc. ("T. Rowe Price Associates").**  T. Rowe Price Associates is a wholly-owned subsidiary of T. Rowe Price, is a party-in-interest to

11

the 401(k) Plan under 29 U.S.C. § 1002(14), and provides investment advisory services to all the in-house mutual funds.

32.     **Defendant T. Rowe Price Trust Company ("T. Rowe Price Trust"; collectively with T. Rowe Price Associates, the "T. Rowe Price Investment Affiliates").** T. Rowe Price Trust is a wholly-owned subsidiary of T. Rowe Price, and is a Maryland-chartered, limited-purpose trust company established in 1983.  In addition to offering trustee services, T. Rowe Price Trust is the investment manager of the T. Rowe Price Collective Investment Trust funds in the 401(k) Plan.  Many of the investment manager employees of T. Rowe Price Trust are also employees of T. Rowe Price Associates; moreover, these same individuals manage the same versions of the mutual funds and Collective Investment Trusts.

33.     **Defendants "T. Rowe Price U.S. Retirement Program Trustee Does 1-40" ("Trustees").**  The Trustees are named 401(k) Plan fiduciaries and had the authority and responsibility to select, monitor, and remove or replace investments offered in the 401(k) Plan. The names of the individual Trustees are currently unknown to Plaintiffs.

34.     **Defendant T. Rowe Price Group, Inc. Management Committee** ("Management Committee").  The Management Committee was responsible for day-to-day management of the company, and included some of the highest ranking executives in the company.  The Management Committee was a key manager of the entity T. Rowe Price; it is separately named as a Defendant because of its role as a fiduciary under ERISA, its importance and for clarity.  During the Class Period until some time in the last half of 2015 or 2016, the Management Committee served as a 401(k) Plan fiduciary and had responsibility under the 401(k) Plan Document for appointing and removing Trustees.  The following individuals were members of the Management Committee during that time:

12

A.	**Defendant Christopher D. Alderson**.  Defendant Alderson has been a member of the Management Committee since at least 2010.  At the company, he has been Head of International Equity since 2009, and a Vice President since 2002.

B.	**Defendant Edward C. Bernard**.  Defendant Bernard has been a member of the Management Committee since at least 2010.  He has been Vice Chairman of the company since 2007, and a Vice President since 1989.

C.	**Defendant Michael C. Gitlin**.  Defendant Gitlin was a member of the Management Committee from at least 2010 through 2013.  At the company, he was head of fixed income since 2010, and a Vice President since 2007.

D.	**Defendant James A. C. Kennedy**.  Defendant Kennedy was a member of the Management Committee from at least 2010 through 2014.  He was Chief Executive Officer and President of the company from on or about 2007 through 2015.

E.	**Defendant John D. Linehan**.  Defendant Linehan was a member of the Management Committee from at least 2010 through 2013.  At the company, he was head of U.S. Equity since 2010, and a Vice President since 2001.

F.	**Defendant Brian C. Rogers**.  Defendant Rogers has been a member of the Management Committee since at least 2010.  At the company, he has been chairman since 2007, Chief Investment Officer since 2004, and a Vice President since 1985.

G.	**Defendant William J. Stromberg**.  Defendant Stromberg has been a member of the Management Committee since at least 2010.  At the company, he has been President and Chief Executive Officer since 2016.  Previously, he was Head of Equity from 2010 to 2015 and a Vice President from 1990 to 2015.

H.	**Defendant Eric L. Veiel**.  Defendant Veiel has been a member of the

13

Management Committee since at least 2015.  At the company, he has been head of U.S. Equity since 2016, and a Vice President since 2006.

I.     **Defendant Edward A. Weise**.  Defendant Weise has been a member of the Management Committee since at least 2014.  At the company, he has been head of Fixed Income since January 2015, and a Vice President since 2001.

35.     **Defendant T. Rowe Price Group, Inc. Management Compensation Committee** ("Management Compensation Committee").  The Management Compensation Committee was part of T. Rowe Price; it is named as a Defendant for clarity.  During the Class Period, beginning some time after the last half of 2015 or 2016, the Management Compensation Committee served as a 401(k) Plan fiduciary.  It assumed from the Management Committee the responsibility for appointing and removing Trustees.  Plaintiffs currently have no knowledge of the identities of the members of the Management Compensation Committee.  Henceforth, T. Rowe Price, the Management Committee and its individual members, and the Management Compensation Committee and its individual members, will be referred to collectively as the "**Appointing Fiduciary Defendants**."

36.     **Defendant Does 1-40.**  Plaintiffs do not currently know the identity of all of the Plan's fiduciaries, in particular the identities of the persons who served on the Management Compensation Committee during the Class Period.  Once the identities of those not currently named are ascertained, Plaintiffs will seek leave to join them under their true names.

## IV.     FACTUAL BACKGROUND

### A.   The 401(K) Plan, its Fiduciaries, and its Investments

37.     At all relevant times, the 401(k) Plan was an "employee pension benefit plan" within the meaning of ERISA, 29 U.S.C. §1002(2)(A), and was established to provide retirement

income to T. Rowe Price employees.  T. Rowe Price is the sponsor of the Plan.  The 401(k) Plan

is a defined contribution plan.

38.     In 2015, the 401(k) Plan had over 8,200 participants, and total assets in excess of

$1.7 billion, ranking it among the largest plans, in terms of assets, in the United States.  The total

number of participants in the 401(k) Plan over the class period will be greater.

39.     Every employee benefit plan must provide for one or more named fiduciaries that

jointly or severally possess the authority to control and manage the operation and administration

of the plan.  ERISA, 29 U.S.C. § 1102(a)(1).  Further, a person who functions as a fiduciary is a

fiduciary, even if he or she is not named as such, so long as the person exercises any

discretionary authority or control over the operation or administration of the plan or any

authority or control over the disposition of plan assets.  ERISA, 29 U.S.C. §1001(21)(A).  Each

of the Defendants was named as a fiduciary and/or functioned as one.

40.     T. Rowe Price is an ERISA fiduciary and the sponsor of the 401(k) Plan.  T.

Rowe Price had, at all applicable times, effective control over the activities of its directors,

officers and employees, including over their 401(k) Plan-related activities.  T. Rowe Price, acting

through its Management Committee and its Management Compensation Committee, had the

authority and discretion to appoint, monitor, and remove the 401(k) Plan Trustees.

41.     The Trustees are a named fiduciary of the 401(k) Plan under the plan document.

The Trustees had the authority, discretion, and responsibility to select, monitor, and remove or

replace the 401(k) Plan's investment funds.  Their specific responsibilities included, but were not

limited to:

1.     Selecting and making decisions with respect to removing or replacing

investment vehicles for the 401(k) Plan.

15

2.      Monitoring the performance of the 401(k) Plan's investment funds and approving investment changes.

42.     The T. Rowe Price Investment Affiliates are T. Rowe Price subsidiaries and the investment advisor to the in-house funds.  The T. Rowe Price Investment Affiliates, and their subsidiaries, receive millions of dollars each year in fees from 401(k) Plan assets for those services.  The T. Rowe Price Investment Affiliates are 401(k) Plan fiduciaries in that they regularly dispensed investment advice to the 401(k) Plan Trustees, which advice was routinely followed, and T. Rowe Price Trust directly manages Plan assets held in the Collective Investment Trusts in the 401(k) Plan.

43.     During the Class Period, the 401(k) Plan offered between 80 and 95 investment funds to participants each year.  All of these were in-house funds.

44.     Because some funds were added and removed during the Class Period, a total of some 146 different funds were offered in the 401(k) Plan during the Class Period.

### B. Defendants Retained High Cost Proprietary Funds in the Plan in their Own Self-Interest and at the Expense of Plaintiffs and the other Plan Participants

45.     Because the 401(k) Plan is laden with high-cost, proprietary funds managed by T. Rowe Price, and Defendants failed to investigate lower-cost, non-proprietary alternatives, the Plan's expenses are significantly higher than other comparable retirement plans.[5]

46.     At the inception of the Class Period, the funds offered through the 401(k) Plan to participants were almost exclusively retail-class shares of T. Rowe Price mutual funds, which are

---

[5] Compounding this problem, Defendants also failed to include the least expensive share class or investment vehicle of certain proprietary funds in the Plan.  *See infra* at ¶¶ 51-72.

the most expensive type of investment fund offered in 401(k) plans.[6]  In 2012, likely in response to lawsuits filed against other 401(k) Plan fiduciaries, less costly Collective Investment Trust versions of these funds (many of which, as discussed below, were in existence years before being made available to Plan participants) were also added to the 401(k) Plan.  In 2014, some institutional-class shares of mutual funds, which were less costly and were also available years before they were offered in the 401(k) Plan, were added to the Plan.  Nevertheless, the most expensive share class, the retail-class shares, is still offered for some of the T. Rowe Price mutual funds in the 401(k) Plan.

47.      Regardless of the type of investment fund offered in the 401(k) Plan, there were comparable lower-cost alternatives for all the funds offered through Plan, whether they were sponsored by T. Rowe or another investment company.  A 2016 joint study by the Investment Company Institute ("ICI"), the trade association of regulated investment companies, and Brightscope, Inc.,  a company specializing in analysis of 401(k) Plan investments, compiled comparative data with respect to the average cost of mutual funds for 401(k) plans of various sizes.[7]  (The study only compiled data with respect to mutual funds; collective trust funds were not assessed, and the most recent year for which data was used in the study is 2014).  The largest category was 401(k) plans exceeding $1 billion in assets, such as the 401(k) Plan here.  Taking into account all administrative and investment expenses within the Plan for all funds offered at that time (including mutual funds and collective trusts), and using 2014 year-end balances and publicly available information regarding each investment's expenses, Plaintiffs estimate that

---

[6] In this complaint, "mutual fund" refers to an investment fund governed by the Investment Company Act of 1940.

[7] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* (December 2016) ("ICI Study").

total  Plan costs for 2014 were approximately $10,100,000, or nearly 0.62% of the $1,650,255,000 in Plan assets.

48.     The T. Rowe Price 401(k) Plan's total costs are extremely high for defined-contribution plans with a similar amount of assets.  For example, in 2014, the average total plan cost for plans over $1 billion in assets (like the Plan here) was 0.30%, compared with total plan costs of 0.62% for the Plan in 2014. ICI Study at 49.  Accordingly, in 2014, even taking into account (what should be) cheaper investment vehicles, like collective/common trusts, the Plan's expenses were ***more than double*** the average similarly sized plan.

49.     In fact,  if only the Plan's mutual funds were considered (as was done in the ICI Study), the Plan's expenses are shown to be even more expensive: 0.73% for each dollar invested in a T. Rowe Price mutual fund. This is ***144% more*** than the average plan's costs. Correspondingly, the expenses for virtually all of the in-house mutual funds currently offered in the Plan are *above average* for 401(k) plans of this size.

50.     These average-based comparisons of overall Plan costs actually understate the excessiveness of the investment management fees paid by the Plan's participants.  The fees charged by the T. Rowe Price funds in the Plan were generally many times higher than the fees in comparable funds offered by other mutual fund companies that were frequently used by other plans.  The following table compares the expense ratios[8] of the 96 funds in the 401(k) Plan at the end of 2016.  As shown by the chart below, the fees for funds within the Plan were ***up to 25 times higher*** than alternatives in the same investment style. The table compares expense ratios as

---

[8] The "expense ratio" of an investment fund represents the ratio of the operating fee taken annually from fund assets to the total amount of assets under management in the fund.  Hence, if the expense ratio is 1.00%, $100 would be taken from a $10,000 investment each year as an operating fee.  Expenses such as trading costs are not included in the expense ratio.

reported by T. Rowe Price with the expense ratios of comparable funds offered by other mutual

fund companies, e.g. the Vanguard Group, Inc., who have funds suitable for use in large 401(k)

plans.[9]  These non-proprietary funds are comparable insofar as they invest in the same asset

classes, invest in the same market segments, carry similar risk profiles, and have similar

investment strategies as the respective T. Rowe Price fund. The expense ratios of all of the

comparable funds are lower than those of the T. Rowe Price investment funds, in many cases by

a substantial margin.

| T. Rowe Price Fund | Ticker Symbol | T. Rowe Price Expense Ratio | Comparable Vanguard or other Fund (*= non-Vanguard fund) | Expense Ratio | Excess Over Vanguard or Other Fund |
|---|---|---|---|---|---|
| **MUTUAL FUNDS** | | | | | |
| Africa & Middle East Fund, Instl | TRIAX | 1.19% | GILVX* | 0.84% | 42% |
| Asia Opportunities Fund | TRAOX | 2.29% | VPKIX | 0.09% | 2,444% |
| Balanced Fund | RPBAX | 0.72% | VWENX | 0.18% | 300% |
| Concentrated International Equity Fund, Instl | RPICX | 0.79% | VTSNX | 0.10% | 690% |
| Core Plus Fund, Instl | TICPX | 0.45% | VCOBX | 0.15% | 200% |
| Corporate Income Fund | PRPIX | 0.73% | VWETX | 0.12% | 508% |
| Credit Opportunities Fund, Instl | TRXPX | 0.67% | VWEAX | 0.13% | 415% |
| Diversified Mid-Cap Growth Fund | PRDMX | 0.87% | VHCAX | 0.38% | 129% |
| Diversified Small-Cap Growth Fund (n/k/a QM U.S. Small-Cap Growth Fund) | PRDSX | 0.66% | VEXRX | 0.34% | 94% |
| Dividend Growth Fund | PRDGX | 0.79% | VGIAX | 0.23% | 243% |

---

[9] The funds identified as being comparable in this complaint are examples of comparable funds, but Plaintiffs are not asserting that they are the only comparable funds or necessarily the most similar funds.  Plaintiffs may determine that other funds, or other fund share classes, are appropriate benchmark funds for purposes of different or future analyses.

| T. Rowe Price Fund | Ticker Symbol | T. Rowe Price Expense Ratio | Comparable Vanguard or other Fund (*= non-Vanguard fund) | Expense Ratio | Excess Over Vanguard or Other Fund |
|---|---|---|---|---|---|
| Emerging Europe and Mediterranean Fund (n/k/a Emerging Europe Fund) | TREMX | 1.76% | GILVX* | 0.84% | 110% |
| Emerging Markets Bond Fund, Instl | TREBX | 0.70% | VEMBX | 0.60% | 17% |
| Emerging Markets Corporate Bond Fund | TRECX | 1.36% | VEMBX | 0.60% | 127% |
| Emerging Markets Local Currency Bond Fund | PRELX | 1.24% | VEMBX | 0.60% | 107% |
| Emerging Markets Value Stock | PRIJX | 5.06% | GILVX* | 0.84% | 502% |
| European Stock Fund | PRESX | 0.95% | VESIX | 0.08% | 1,088% |
| Extended Equity Market Index Fund | PEXMX | 0.35% | VIEIX | 0.07% | 400% |
| Financial Services Fund | PRISX | 0.95% | VFAIX | 0.10% | 850% |
| Floating Rate Fund, Instl | RPIFX | 0.56% | IFRPX* | 0.12% | 367% |
| Frontier Markets Equity Fund, Instl | PRFFX | 1.84% | GILVX* | 0.84% | 119% |
| Global Allocation Fund | RPGAX | 1.25% | RIRGX* | 0.30% | 317% |
| Global Focused Growth Equity Fund, Instl | TRGSX | 0.96% | VHGEX | 0.57% | 68% |
| Global Growth Equity Fund, Instl | RPIGX | 0.77% | VHGEX | 0.57% | 35% |
| Global High Income Bond I | RPIHX | 0.85% | VWEAX | 0.13% | 554% |
| Global Industrials Fund | RPGIX | 2.39% | VINAX | 0.10% | 2,290% |
| Global Multi-Sector Bond Fund, Instl | RPGMX | 0.50% | VTIFX | 0.07% | 614% |
| Global Real Estate Fund | TRGRX | 1.05% | VGRNX | 0.13% | 708% |
| Global Technology Fund | PRGTX | 0.91% | VITAX | 0.10% | 810% |
| Global Unconstrained Bond I | RPIEX | 0.75% | VTIFX | 0.07% | 971% |
| Global Value Equity Fund, Instl | PRIGX | 3.68% | VHGEX | 0.57% | 546% |
| GNMA Fund | PRGMX | 0.59% | VFIJX | 0.11% | 436% |
| Health Sciences Fund | PRHSX | 0.69% | VGHAX | 0.29% | 138% |
| High Yield Fund, Instl | TRHYX | 0.55% | VWEAX | 0.13% | 323% |
| Inflation Protected Bond Fund | PRIPX | 0.97% | VIPIX | 0.08% | 1,113% |

| T. Rowe Price Fund | Ticker Symbol | T. Rowe Price Expense Ratio | Comparable Vanguard or other Fund (*= non-Vanguard fund) | Expense Ratio | Excess Over Vanguard or Other Fund |
|---|---|---|---|---|---|
| International Bond Fund, Instl | RPIIX | 0.55% | VTIFX | 0.07% | 686% |
| International Equity Index Fund | PIEQX | 0.45% | VTMGX | 0.09% | 400% |
| Japan Fund | PRJPX | 1.05% | VPKIX | 0.09% | 1,067% |
| Large-Cap Growth Fund, Instl | TRLGX | 0.56% | VPMAX | 0.33% | 70% |
| Large-Cap Value Fund, Instl | TILCX | 0.57% | VUVLX | 0.26% | 119% |
| Latin America Fund | PRLAX | 1.37% | GILVX* | 0.84% | 63% |
| Long Duration Credit Fund, Instl | RPLCX | 0.45% | VWETX | 0.12% | 275% |
| Media & Telecommunications Fund | PRMTX | 0.69% | VTCAX | 0.10% | 590% |
| Mid-Cap Equity Growth Fund, Instl | PMEGX | 0.61% | VHCAX | 0.38% | 61% |
| New America Growth Fund | PRWAX | 0.95% | VPMAX | 0.33% | 188% |
| New Asia Fund | PRASX | 0.82% | VPKIX | 0.09% | 811% |
| New Era Fund | PRNEX | 0.58% | VMIAX | 0.10% | 480% |
| Personal Strategy Balanced Fund | TRPBX | 0.75% | VWENX | 0.18% | 317% |
| Personal Strategy Growth Fund | TRSGX | 0.79% | VASGX | 0.15% | 427% |
| Personal Strategy Income Fund | PRSIX | 0.65% | VWIAX | 0.15% | 333% |
| Real Estate Fund | TRREX | 0.85% | VGSNX | 0.10% | 750% |
| Science & Technology Fund | PRSCX | 0.66% | VITAX | 0.10% | 560% |
| Short-Term Bond Fund | PRWBX | 0.36% | VFSIX | 0.07% | 414% |
| Small-Cap Stock Fund, Instl | TRSSX | 0.67% | VSTCX | 0.34% | 97% |
| Spectrum Growth Fund | PRSGX | 0.79% | VPMAX | 0.33% | 139% |
| Spectrum Income Fund | RPSIX | 0.69% | VWIAX | 0.15% | 360% |
| Spectrum International Fund | PSILX | 0.94% | VTSNX | 0.09% | 944% |
| Summit Cash Reserves Fund | TSCXX | 0.41% | VMRXX | 0.10% | 310% |
| Total Equity Market Index | POMIX | 0.30% | VINIX | 0.04% | 650% |

| T. Rowe Price Fund | Ticker Symbol | T. Rowe Price Expense Ratio | Comparable Vanguard or other Fund (*= non-Vanguard fund) | Expense Ratio | Excess Over Vanguard or Other Fund |
|---|---|---|---|---|---|
| Fund | | | | | |
| U.S. Large Cap Core Fund | TRULX | 0.91% | VGIAX | 0.23% | 296% |
| U.S. Treasury Intermediate Fund | PRTIX | 0.51% | VFIUX | 0.10% | 410% |
| U.S. Treasury Long-Term Fund | PRULX | 0.52% | VLGSX | 0.10% | 420% |
| Ultra Short-Term Bond Fund | TRBUX | 0.40% | VUSFX | 0.12% | 233% |
| *COLLECTIVE INVESTMENT TRUSTS* | | | | | |
| Blue Chip Growth Trust T1 | ` | 0.55% | VPMAX | 0.33% | 67% |
| Bond Trust I, T5 | - | 0.44% | VCOBX | 0.15% | 193% |
| Capital Appreciation Trust A | - | 0.57% | VWENX | 0.18% | 217% |
| Emerging Markets Equity Trust A | - | 1.00% | GILVX* | 0.84% | 19% |
| Equity Income Trust A | - | 0.50% | VUVLX | 0.26% | 92% |
| Equity Index Trust Class C | | 0.10% | VINIX | 0.04% | 150% |
| Equity Index Trust Fund | - | 1.04% | VINIX | 0.04% | 2,500% |
| Growth & Income Trust D | - | 0.60% | VGIAX | 0.23% | 161% |
| Growth Stock Trust D | - | 0.52% | VPMAX | 0.33% | 58% |
| International Core Equity Trust D | - | 0.65% | VTSNX | 0.10% | 550% |
| International Growth Equity Trust D | - | 0.65% | VWIGX | 0.46% | 41% |
| International Small-Cap Equity Trust D | - | 1.04% | VINEX | 0.41% | 154% |
| International Value Equity Trust D | - | 0.65% | VTRIX | 0.46% | 41% |
| New Horizons Trust A | - | 0.65% | VSTCX | 0.34% | 91% |
| Real Assets Trust I D | - | 0.65% | VMIAX | 0.10% | 550% |
| Retirement 2005 Active Trust A | - | 0.54% | VIRTX | 0.10% | 440% |
| Retirement 2010 Active Trust A | - | 0.54% | VIRTX | 0.10% | 440% |
| Retirement 2015 Active Trust A | - | 0.54% | VITVX | 0.10% | 440% |
| Retirement 2020 Active | - | 0.54% | VITWX | 0.10% | 440% |

| T. Rowe Price Fund | Ticker Symbol | T. Rowe Price Expense Ratio | Comparable Vanguard or other Fund (*= non-Vanguard fund) | Expense Ratio | Excess Over Vanguard or Other Fund |
|---|---|---|---|---|---|
| Trust A | | | | | |
| Retirement 2025 Active Trust A | - | 0.54% | VRIVX | 0.10% | 440% |
| Retirement 2030 Active Trust A | - | 0.54% | VTTWX | 0.10% | 440% |
| Retirement 2035 Active Trust A | - | 0.54% | VITFX | 0.10% | 440% |
| Retirement 2040 Active Trust A | - | 0.54% | VIRSX | 0.10% | 440% |
| Retirement 2045 Active Trust A | - | 0.54% | VITLX | 0.10% | 440% |
| Retirement 2050 Active Trust A | - | 0.54% | VTRLX | 0.10% | 440% |
| Retirement 2055 Active Trust A | - | 0.54% | VIVLX | 0.10% | 440% |
| Retirement 2060 Active Trust A | | 0.54% | VILVX | 0.10% | 440% |
| Retirement Balanced Trust B | | 0.49% | VITRX | 0.10% | 390% |
| Structured Research Trust B | - | 0.45% | VGIAX | 0.23% | 96% |
| U.S. Bond Enhanced Index Trust B | - | 0.15% | VBTIX | 0.05% | 200% |
| U.S. Mid-Cap Value Equity Trust D | - | 0.64% | VASVX | 0.39% | 64% |
| U.S. Small-Cap Value Equity Trust D | - | 0.66% | VEVFX | 0.57% | 16% |
| U.S. Treasury MM Trust B | - | 0.12% | VUSXX | 0.09% | 33% |
| U.S. Value Equity Trust D | - | 0.64% | VUVLX | 0.26% | 146% |

## C.  Defendants Failed to Procure the Least Expensive Available Share Class of Numerous Funds

51.     Defendants also failed to offer the lowest-cost share class or investment fund with respect to the actual investment funds offered in the Plan.  By way of background, most mutual funds and other investments such as collective trusts offer multiple classes of shares that are

targeted at different investors, generally based on the amount of assets invested; the most expensive investment funds are offered to retail investors who invest less. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors (such as pension funds like the T. Rowe Price 401(k) Plan) with more assets to invest (generally $1 million or more) and therefore greater bargaining power. There is no material difference between share classes or otherwise identical collective investment trusts other than costs. Thus, utilizing the cheapest share class or investment vehicle provides an identical—but less expensive—version of the same investment, which often involves the same investment manager and an identical mix of investments within each investment fund. Given the size of the T. Rowe Price 401(k) Plan, and its uniquely intimate relationship with the investment manager, T. Rowe Price Investment Affiliates, the Plan had sufficient bargaining power and access to the most up-to-date information to obtain the lowest cost share class or investment vehicle available at any given time for the Plan's investment lineup of proprietary T. Rowe Price funds.  However, Defendants did not do this for the Plan.

52.     Instead, during the Class Period, retail class versions of in-house mutual funds were offered to 401(k) Plan participants despite the fact that less expensive versions of the same funds were available and offered to T. Rowe Price's commercial customers.  The same is true with respect to the in-house Collective Investment Trusts offered in the 401(k) Plan; less expensive classes of many of these were available to T. Rowe Price's commercial customers. These cheaper classes reflect reduced administrative and management costs obtainable with a large institutional investor's substantial bargaining power. Accordingly, the in-house funds offered in the 401(k) Plan were expensive not only compared to funds offered by other investment companies, but also compared to other funds offered by T. Rowe Price itself.

53.     For example, the Blue Chip Growth Fund is a retail mutual fund included in the

Plan until 2012. In 2012, the 401(k) Trustees replaced this fund with a cheaper, but otherwise

materially identical collective trust version of the same fund: the Blue Chip Growth Trust class

T1, which charged 28% less in fees than the retail mutual fund it replaced. In 2014, the Trustees

replaced the T1 class with the T5 class of the Blue Chip Growth Trust, which was materially

identical to the T1 class, but further reduced fees by 3.5%. This collective trust and all its classes

were offered to other investors **for three years** before it replaced the retail mutual fund. T. Rowe

Price had created a cheaper T4 class at the same time it created the T1 and T5 classes, but

Defendants failed to include the least expensive class for the Plan. Defendants' failure to timely

move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical

collective trust version, in conjunction with their failure to use the cheapest trust class, was

particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees

paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee

of 77 basis points[10] from February 2011 until some time in 2012 to pay for expenses associated

with the Plan's investment in the Blue Chip Growth Fund, 57 basis points from 2013 until some

time in 2014 to pay for expenses associated with T1 class, and 55 basis points thereafter to pay

for expenses associated with the T5 class. Had the Trustees added the T4 class trust instead of

the retail mutual fund and more expensive trust classes, however, the Plan would have paid just

40 basis points. For the Plan's average annual balance of $46.4 million invested in the retail Blue

Chip Growth Fund and the two more expensive trust classes from February 2011 through 2015,

the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $560,000 in excess

---

[10] A "basis point" is a common financial measure of value. One basis point is equal to 1/100 of
1%, such that 100 basis points is equal to 1%.

fees.[11]

54.     The Capital Appreciation Fund provides another example.  This retail mutual fund was included in the Plan until 2012. In 2012, the Trustees replaced this fund with a cheaper, but otherwise materially identical collective trust version of the same fund: the Capital Appreciation Trust class D, which charged 17% less in fees than the retail mutual fund it replaced. In 2014, Defendant Trustees replaced the D class with the A class of the Capital Appreciation Trust, which was materially identical to the D class, but further reduced fees by 2%. This collective trust and all its classes were offered to other investors **for six years** before it replaced the retail mutual fund. T. Rowe Price had created a cheaper B class at the same time it created the A and D classes, but Defendants failed to include the least expensive class for the Plan. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical collective trust version, in conjunction with their failure to use the cheapest trust class, was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. As a result, T. Rowe Price Investment Affiliates received an annual fee of 71 basis points from February 2011 until some time in 2012 to pay for expenses associated with the Plan's investment in the Capital Appreciation Fund, 59 basis points from 2013 until some time in 2014 to pay for expenses associated with D class, and 57 basis points thereafter to pay for expenses associated with the A class. Had the Trustees added the B class trust instead of the retail mutual fund and more expensive trust classes, however, the Plan would have paid just 55 basis points. For the Plan's average annual balance of $53.2 million invested in the retail Capital Appreciation Fund and the two more expensive trust classes from February

---

[11] Without discovery, Plaintiffs' do not know the exact date Defendant Trustees switched the investments' share classes or the precise balance the Plan had invested in these investment at any given time. All figures described herein are estimates and subject to change following discovery.

2011 through 2015, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $170,000 in excess fees.

55.     Similarly, the Growth Stock Fund is a retail mutual fund included in the Plan until 2012, when it was replaced with a cheaper, but otherwise materially identical collective trust version of the same fund: the Growth Stock Trust class D, which charged 25.7% less in fees than the retail mutual. However, this collective trust and all its classes were offered to other investors **for six years** before it replaced the retail mutual fund. T. Rowe Price had created a less expensive C class at the same time it created the D class, but the 401(k) Trustees failed to include this least expensive class for the Plan. The C class charged 23% less in fees than the otherwise materially identical D class. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical collective trust version, in conjunction with their failure to use the cheapest trust class, was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 70 basis points from February 2011 until some time in 2012 to pay for expenses associated with the Plan's investment in the Growth Stock Fund and 52 basis points thereafter to pay for expenses associated with the Plan's investment in the Growth Stock Trust class D. Had the Trustees added the C class trust instead of the retail mutual fund and more expensive trust class, however, the Plan would have paid just 40 basis points. For the Plan's average annual balance of more than $38 million invested in retail Growth Stock Fund and two more expensive trust classes from February 2011 through 2015, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $370,000 in excess fees.

56.     Likewise, the Equity Income Fund is a retail mutual fund that was included in the

27

Plan until 2012. In 2012, Defendant Trustees replaced this fund with a cheaper, but otherwise materially identical collective trust version of the same fund: the Equity Income Trust class D, which charged 23.5% less in fees than the retail mutual fund it replaced. This collective trust was offered to other investors **for six years** before it replaced the retail mutual fund. In 2014, Defendant Trustees replaced the Equity Income Trust class D with the A class of the same trust. The A class was created at the same time as the D class and cost 4% less in fees. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical collective trust version, in conjunction with their failure to timely use the least expensive trust class, was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 68 basis points from February 2011 until some time in 2012 to pay for expenses associated with the Plan's investment in the Equity Income Fund and 52 basis points between from 2012 until some time in 2014 to pay for expenses associated with the Plan's investment in the Equity Income Trust class D. Had the Trustees timely added the A class trust instead of the retail mutual fund and more expensive trust class, however, the Plan would have paid just 50 basis points. For the Plan's average annual balance of $40 million invested in the Equity Income Fund and class D trust from February 2011 until some time in 2014 the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $125,000 in excess fees.

57.     The New Horizons Fund is a retail mutual fund that was included in the Plan until 2012. In 2012, Defendant Trustees replaced this fund with a cheaper, but otherwise materially identical collective trust version of the same fund: the New Horizons Trust class D, which charged 17% less in fees than retail mutual fund it replaced. This collective trust was offered to other investors **for six years** before it replaced the retail mutual fund. In 2014, Defendant

28

Trustees replaced with New Horizons Trust class D with the A class of the same trust. The A

class was created at the same time as the D class and cost 3% less in fees. Defendants' failure to

timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially

identical collective trust version, in conjunction with their failure to timely use the cheapest trust

class, was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the

excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received

an annual fee of 81 basis points from February 2011 until some time in 2012 to pay for expenses

associated with the Plan's investment in the New Horizons Fund and 67 basis points from 2012

until some time in 2014 to pay for expenses associated with the Plan's investment in the New

Horizons Trust class D. Had the Trustees added the A class trust instead of the retail mutual fund

and more expensive trust class, however, the Plan would have paid just 65 basis. For the Plan's

average annual balance of $46 million invested in the New Horizons Fund and class D from

February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates

gained, approximately $130,000 in excess fees.

     58.     Further examples include the High Yield Fund, a retail mutual fund that was

included in the Plan until 2012, when the Trustees replaced it with a less expensive, but

otherwise materially identical collective trust version of the same fund: the High Yield Trust,

which charged 21.3% less in fees. This collective trust was created just before it was added to the

Plan. **Since 2002**, however, T. Rowe Price offered other investors an institutional class of the

High Yield Fund that was 15.2% less expensive than the newly created High Yield Trust. It was

not until 2014 that Defendants replaced the High Yield Trust with the cheaper institutional class

of the High Yield Fund. Defendants' failure to timely move Plan assets from the higher-cost

retail mutual fund to the otherwise materially identical institutional class was particularly

beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 75 basis points from February 2011 until some time in 2012 to pay for expenses associated with the Plan's investment in the retail High Yield Fund and 59 basis points from 2012 until some time in 2014 to pay for expenses associated with the Plan's investment in the High Yield Trust. Had the Trustees timely added the institutional class High Yield Fund instead of the more expensive retail mutual fund and trust, the Plan would have paid just 50 basis points. For the Plan's average annual balance of $19 million invested in the retail High Yield Fund and High Yield Trust from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $125,000 in excess fees.

59.     Likewise, the Mid-Cap Growth Fund is a retail mutual fund that was included in the Plan until 2012. In 2012, Defendant Trustees replaced this fund with a cheaper, but otherwise materially identical collective trust version of the same fund: the Mid-Cap Growth Equity Trust, which charged 21% less in fees than the retail mutual fund it replaced. This collective trust was created just before it was added to the Plan. **Since 1996**, however, T. Rowe Price offered other investors an institutional class of the Mid-Cap Growth Fund that was 3% less expensive than the newly created Mid-Cap Growth Trust. It was not until 2014 that Defendants replaced the Mid-Cap Growth Trust with the cheaper institutional class of the Mid-Cap Growth Fund. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical institutional class was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 80 basis points from February 2011 until some time in 2012 to pay for expenses associated with the Plan's investment in the retail Mid-Cap

Growth Fund and 63 basis points from 2012 until some time in 2014 to pay for expenses associated with the Plan's investment in the Mid-Cap Growth Equity Trust. Had the Trustees timely added the institutional class Mid-Cap Growth Fund instead of the more expensive retail mutual fund and trust, the Plan would have paid just 61 basis points. For the Plan's average annual balance of $55.5 million invested in the retail Mid-Cap Growth Fund and Mid-Cap Growth Trust from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $190,000 in excess fees.

60.     Defendants delayed replacing other retail mutual funds until 2014.  For example, the Trustees retained the Emerging Markets Stock Fund until replacing it with a cheaper, but otherwise materially identical collective trust version of the same fund: the Emerging Markets Equity Trust, in 2014.  The trust charged 21% less in fees than the retail mutual fund it replaced. This collective trust was offered to other investors for **more than fifteen years** before it replaced the retail mutual fund. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical collective trust version was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 126 basis points to pay for expenses associated with the Plan's investment in the Emerging Markets Stock Fund from February 2011 until some time in 2014. T. Rowe Price Investment Affiliates managed the materially identical Emerging Markets Equity Trust that charged investors an annual fee of 100 basis points. For the Plan's average annual balance of $21.7 million invested in the Emerging Markets Stock Fund from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $226,000 in excess fees. A cheaper but otherwise materially identical institutional class of the Emerging Markets Stock

Fund was also offered to other investors twelve years before Defendant Trustees removed the retail class.

61.     Similarly, the Capital Opportunity Fund is a retail mutual fund that was included in the Plan until 2014. In 2014, the 401(k) Trustees replaced this fund with a cheaper, but otherwise materially identical collective trust version of the same fund: the Structures Research Trust, which charged 38% less in fees than the retail mutual fund it replaced. This collective trust was offered to other investors **for nine years** before it replaced the retail mutual fund. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical collective trust version was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 73 basis points to pay for expenses associated with the Plan's investment in the Capital Opportunity Fund from February 2011 until some time in 2014. T. Rowe Price Investment Affiliates managed the materially identical Structured Research Trust that charged investors an annual fee of only 45 basis points. For the Plan's average annual balance of $7 million invested in the Capital Opportunity Fund from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $75,000 in excess fees.

62.     Also in 2014, the Trustees replaced some retail mutual funds with less expensive, but otherwise identical institutional class shares that had been offered to commercial customers for years.  For example, the retail mutual fund Emerging Markets Bond Fund was replaced with a cheaper, but otherwise materially identical institutional class of the same fund that charged 25% less in fees. This institutional class fund was offered to other investors **for eight years** before it replaced the retail mutual fund. Defendants' failure to timely move Plan assets from the

higher-cost retail mutual fund to the otherwise materially identical institutional class was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 94 basis points to pay for expenses associated with the Plan's investment in the retail Emerging Markets Bond Fund from February 2011 until some time in 2014. T. Rowe Price Investment Affiliates managed the materially identical institutional class that charged investors an annual fee of 70 basis points. For the Plan's average annual balance of $8.5 million invested in the retail Emerging Markets Bond Fund from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $80,000 in excess fees.

63. The Floating Rate Fund is a retail mutual fund that was included in the Plan until 2014. In 2014, Defendant Trustees replaced this fund with a cheaper, but otherwise materially identical institutional class of the same fund, which charged 29% less in fees than the retail mutual fund it replaced. This institutional class fund was offered to other investors **for six years** before it replaced the retail mutual fund. Defendants' failure to timely move Plan assets from the higher-cost retail mutual fund to the otherwise materially identical institutional class was particularly beneficial to T. Rowe Price Investment Affiliates, which collected the excess fees paid by the Plan. By way of example, T. Rowe Price Investment Affiliates received an annual fee of 85 basis points to pay for expenses associated with the Plan's investment in the retail Floating Rate Bond Fund from February 2011 until some time in 2014. T. Rowe Price Investment Affiliates managed the materially identical institutional class that charged investors an annual fee of 56 basis points. For the Plan's average annual balance of $3.2 million invested in the retail Floating Rate Fund from February 2011 until some time in 2014, the Plan lost, and T. Rowe Price Investment Affiliates gained, approximately $28,000 in excess fees.

33

64.     Even if Defendant Trustees were unable to obtain cheaper investment vehicles in-house (which they were), they had sufficient knowledge and bargaining power to obtain them through a third-party. Notably, in addition to sponsoring and managing namesake mutual funds, T. Rowe Price and the T. Rowe Price Investment Affiliates managed proprietary T. Rowe Price strategies for third-party fund providers. T. Rowe Price Investment Affiliates did this by serving as a "sub-adviser" to these third-party funds. As a sub-adviser, T. Rowe Price Investment Affiliates made investment decisions and trades for third-party funds (the "Sub-Advised Funds") identical or substantially identical to those made for T. Rowe Price namesake funds. Some of these Sub-Advised Funds were materially identical to the T. Rowe Price namesake analogues in all respects but cost. Indeed, some of the Sub-Advised Funds were *cheaper* than their respective T. Rowe Price analogue, despite otherwise being materially identical.

65.     For instance, T. Rowe Price Investment Affiliates performed sub-advisory services for Voya Financial, which in turn created and offered the VY T. Rowe Price Capital Appreciation Portfolio, a fund materially identical to the T. Rowe Price Capital Appreciation Fund. The VY T. Rowe Price Capital Appreciation Portfolio had a net expense ratio of 66 basis points in 2011 and 2012, while the T. Rowe Price Capital Appreciation Fund had a net expense ratio of 71 basis points during this time. The VY T. Rowe Price Capital Appreciation Portfolio and T. Rowe Price Capital Appreciation Fund did materially the same thing, were managed by the same person, and executed the same strategy, but the Voya fund was 7% cheaper than the proprietary retail mutual fund Defendant Trustees selected and retained in the Plan.

66.     The same arrangement and outcome is seen with other funds offered in the 401(k) Plan lineup, including, but not limited to the Blue Chip Growth Fund, Equity Income Fund, and International Stock Fund; each of which had cheaper, yet materially identical Sub-Advised

34

analogues that could have replaced their respective T. Rowe Price retail funds. Had the 401(k) Trustees used the Sub-Advised Funds instead of their proprietary retail mutual funds, the Plan would have received the same investment for fewer fees. The Trustees failed to consider these cheaper Sub-Advised Funds – particularly where less expensive in-house alternatives to certain retail class mutual funds did not exist – even though they could have saved the Plan money by including them instead of their own retail mutual funds.

67.     Moreover, when serving as a sub-adviser to these third-party commercial clients, T. Rowe Price Investment Affiliates were willing to accept a *substantially* reduced fee for the investment advisory services it provided those clients, as compared to the fee T. Rowe Price namesake funds paid the T. Rowe Price Investment Affiliates for the materially identical services.

68.     The instances described *supra* are only a few examples of the 401(k) Trustees' failure to wield their leverage to obtain favorable investment products. For instance, the Plan participates in the A class of T. Rowe Price's target date suite, even though T. Rowe Price offers *four less expensive classes of this same suite* that range from *9 to 40% less* than what the Trustees selected for the Plan.

69.     At all relevant times, the Plan had sufficient capital and bargaining power to access the least expensive investment classes. In fact, the minimum investment to participate in the institutional class is only $1,000,000, an amount the Plan easily satisfies. In any event, this minimum is not absolute and T. Rowe Price reserved the right to *waive* or lower its minimum investment requirements.

70.     In sum, Defendant Trustees failed to timely consider – or in some instances failed to consider at all – the cheapest classes available to large institutional investors. To the extent

necessary, the Trustees also failed to seek waivers or reductions of the minimum investment needed to invest in the least expensive classes.

71.     The Trustees' failures not only provided T. Rowe Price Investment Affiliates a direct financial benefit, but enhanced the marketability of T. Rowe Price Investment Affiliates' more expensive investment offerings to other investors.  As discussed more fully below, Defendants used Plan assets to seed certain newly created funds, only moving those assets to less expensive, identical versions of these funds when the Plan's assets had sufficiently achieved marketability of these new funds to attract outside investors.

72.     As noted above, during the Class Period, 401(k) Plan participants were required to pay in excess of **$50 million** in fees to T. Rowe Price Associates as a result of their 401(k) Plan investments.  Plaintiffs have determined that if alternative comparable funds such as those listed in the above table had been used in the 401(k) Plan, rather than the in-house funds, 401(k) Plan participants would have paid over **$27 million** *less* in fees during the Class Period.

D.  **Defendants Failed to Adequately Monitor Plan Investments and Remove Poorly Performing Investments**

73.     Defendants also failed to monitor the Plan's investments, and failed to remove numerous funds that had a history of underperforming their benchmarks[12] and readily available alternatives, in violation of their fiduciary duties under ERISA.  This cost Plan participants millions of dollars due to these funds' underperformance compared with prudent investment alternatives.  Though numerous funds within the Plan underperformed alternative investments

_____

[12] A benchmark is "a standard against which the performance of a security, mutual fund or investment manager can be measured." Investopedia, http://www.investopedia.com/terms/b/ benchmark.asp (last visited Jul. 19, 2017). Comparing a mutual funds' performance to that of a benchmark allows an investor to determine how a portfolio of similar securities and risk performed relative to the mutual fund over the same period of time. The benchmarks were chosen by the Defendants.

that charged far fewer fees, the following recent examples highlight Defendants' retention of excessively expensive investments from the Plan despite their underperformance.

### *Defendants Retained the Financial Services Fund in the Plan despite Chronic Underperformance*

74.     During the Class Period, Defendants caused the Plan to hold and retain the T. Rowe Price Financial Services Fund (ticker: PRISX) despite its continually poor performance, underperforming its benchmark (the Russell 3000 Financial Index)[13] and the comparable Vanguard Financials Index Fund (ticker: VFAIX), despite the T. Rowe Price Financial Services Fund charging an 850% premium over the Vanguard alternative.

75.     From 2011 through 2016, the Financial Services Fund underperformed its benchmark by nearly 10%. It also underperformed the comparable Vanguard Financials Index Fund by approximately 13% during this same period, despite the T. Rowe Price fund costing participants an 850% premium. Both these funds invest most their assets in the equity of domestic banks and insurance companies, and carry similar risk profiles. Both funds have 3-year standard deviations near 15%.[14] Nonetheless, Defendants continued to retain the Financial Services Fund in the Plan, reflecting a failure to properly evaluate the Plan's investments on a regular basis without giving preferential treatment to T. Rowe Price funds.  Participants whose Plan accounts were invested in this fund incurred sub-standard returns that places a continuous drag on their retirement income growth.

---

[13] Again, the benchmark was chosen by Defendants.

[14] T. Rowe Price's investor website defines standard deviation as "[a] measure of risk that indicates the volatility of a portfolio's total returns as measured against its mean performance. In general, the higher the standard deviation, the greater the volatility or risk."

### Defendants Retained the Spectrum Growth Fund in the Plan despite Chronic Underperformance

76.     During the Class Period, Defendants also caused the Plan to hold and retain the T. Rowe Price Spectrum Growth Fund (ticker PRSGX) despite its continually poor performance, underperforming its benchmark (the Russell 3000 Index) and the comparable Vanguard PRIMECAP Fund, despite the T. Rowe Price Spectrum Growth Fund charging a 139% premium over the Vanguard alternative.

77.     From 2011 through 2016, the T. Rowe Price Spectrum Growth Fund underperformed its benchmark by 32.24%. It also underperformed the comparable PRIMECAP Fund by 46% during this same period, despite the T. Rowe Price Spectrum Growth Fund costing participants a 139% premium over the Vanguard alternative. Both these funds invest in large, medium, and small-cap stocks with an emphasis on large-cap growth companies, and carry similar risk profiles.  Both funds have 3-year standard deviations near 11%.  Nonetheless, Defendants continued to retain the Spectrum Growth Fund in the Plan, reflecting a failure to properly evaluate the Plan's investments on a regular basis without giving preferential treatment to T. Rowe Price funds.  Participants whose Plan accounts were invested in this fund incurred sub-standard returns that places a continuous drag on their retirement income growth.

### Defendants Retained the Small-Cap Value Equity Trust in the Plan despite Chronic Underperformance

78.     During the Class Period, Defendants also caused the Plan to hold and retain the T. Rowe Price Small-Cap Value Equity Trust despite its continually poor performance, underperforming its benchmark (the Russell 2000 Value Index) and the comparable Vanguard Explorer Value Fund (ticker: VEVFX). These funds and the benchmark all invest in small and medium-cap value stocks. Value stocks are stocks of companies that tend to trade at a lower

price relative to fundamental metrics like dividends, earnings and sales.

79.     Between Q1 2012 and Q1 2017, the T. Rowe Price Small-Cap Value Equity

Trust underperformed its benchmark by nearly 4%. It also underperformed the comparable

Vanguard Explorer Value Fund by 4.75% during this same period, despite the T. Rowe Price

Small-Cap Value Equity Trust costing participants a 16% premium over the Vanguard

alternative. Both these funds invest in small and medium-cap stocks with an emphasis on

financial companies, and carry similar risk profiles. Both funds have 3-year standard deviations

near 13.5%. Nonetheless, Defendants continued to retain the Small-Cap Value Equity Trust in

the Plan, reflecting a failure to properly evaluate the Plan's investments on a regular basis

without giving preferential treatment to T. Rowe Price funds. Participants whose Plan accounts

were invested in this fund incurred sub-standard returns that places a continuous drag on their

retirement income growth.

### Defendants Selected and Retained the Global Infrastructure Fund and the Summit GNMA Fund Despite Such Poor Performance that the Funds were Eventually Closed and Plan Assets Transferred

80.     A number of underperforming funds are no longer in the Plan's lineup; not

because the Trustees removed them, but because the funds were forced to close and their assets

had to be moved into other investments. Participants did not select the funds into which their

closed investments' assets were moved. Often, the assets were moved into other

underperforming funds in an effort to give those funds capital needed to sustain the funds'

operations and attract new investors.

81.     For example, during the Class Period, Defendants caused the Plan to hold and

retain the T. Rowe Price Global Infrastructure Fund until it was merged into the T. Rowe Price

Real Asset Fund in mid-2014. While Plan assets were used to support the Global Infrastructure

Fund, the fund had relatively few additional assets under management and consistently underperformed its benchmark and peer funds. From Q1 2011 to Q1 2014, the Global Infrastructure Fund underperformed its benchmarks by 2.84% and underperformed peer funds by 5.55%.

82.     The T. Rowe Price Real Asset Fund, into which the Global Infrastructure Fund's assets were transferred, had a limited track-record and was dramatically underperforming its benchmark at the time of the fund merger. The Real Asset Fund had underperformed its benchmark by over 32% in the three years before the Global Infrastructure Fund closed.

83.      Similarly, the Summit GNMA Fund was retained in the Plan's lineup despite poor performance until the fund was forced to close and its assets merged into the T. Rowe Price GNMA Fund. In the five years prior to its closing in mid-2014, the Summit GNMA Fund had underperformed its benchmark by 1.16% and peer funds by 1.63%.

84.     But for Defendants' imprudent and disloyal administration of the Plan, these underperforming funds would not have been added to the Plan and would have otherwise been removed and replaced after continued underperformance.

### Defendants Relied on Improper Benchmarks to Erroneously Report Adequate Fund Performance

85.     In asserting that some of their funds performed well, T. Rowe Price relies on comparisons to benchmarks that do not adequately correspond to the investment strategy and risk profile of the respective investment.

86.     For instance, Defendants compare the performance of the T. Rowe Price Growth Stock Trust to the S&P 500 Index. The T. Rowe Price Growth Stock Trust invests primarily in "growth" companies; those "whose business generates significant positive cash flows or

earnings, which increase at significantly faster rates than the overall economy."[15] The S&P 500

Index is not a growth index because it has no bias for growth companies. Instead, the S&P 500

*Growth* Index is an appropriate benchmark. The performance of the S&P 500 Growth Index, just

like the T. Rowe Price Growth Stock Trust, reflects the performance of growth companies with a

particular emphasis on the performance of information technology companies.

87.     Between Q1 2012 and Q1 2017, the T. Rowe Price Growth Stock Trust

underperformed the correct S&P 500 Growth Index benchmark by 1%, even though T. Rowe

Price suggested to participants it had outperformed its benchmark.

88.     If the alternative comparable funds discussed above, among others, had been used

to replace funds in areas in which T. Rowe Price is weak, 401(k) Plan participants would have

earned at least **$123 million** more for their retirement.  And this figure does not include complete

comparisons for roughly two thirds of the in-house investment funds that are collective trust

funds, since Plaintiffs currently lack detailed performance information for all of those funds.

The figure may increase materially once Plaintiffs have access to that data.

## E.   Defendants Used the Retirement Assets of T. Rowe Price Employees to Seed New Investment Vehicles

89.     On numerous occasions, Defendants used Plan assets to support new and

struggling investment vehicles. Accordingly, Defendants used the retirement assets of T. Rowe

Price Plan participants to seed new funds, which made those investments more marketable to

commercial customers, thus increasing profits for T. Rowe Price, while exposing participants to

undue risk and expenses.

90.     For instance, the Trustees directed Plan assets to new trusts instead of the cheaper

---

[15] Investopedia, http://www.investopedia.com/terms/g/growthcompany.asp (last visited Jul. 19, 2017).

institutional class funds to give the trusts the capital they needed to sustain operations and attract new investors.  As discussed, *supra*, in Section VI. C, Defendant Trustees replaced the following retail mutual funds with new collective trusts ***despite the availability of a long-standing, and cheaper, institutional class versions*** of the same funds: Small-Cap Stock Fund, High Yield Fund, and Mid-Cap Growth Fund.

91.     The Trustees replaced the retail T. Rowe Price Small-Cap Stock Fund with the newly created T. Rowe Price Small-Cap Core Equity Trust, despite the fact that T. Rowe Price already offered an institutional version of the Small-Cap Stock Fund that was cheaper than the trust.

92.     The Trustees replaced the retail T. Rowe Price High Yield Fund with the newly created T. Rowe Price High Yield Trust, even though T. Rowe Price already offered an institutional version of the High Yield Fund that was cheaper than the trust.

93.     The Trustees replaced the retail T. Rowe Price Mid-Cap Growth Fund with the T. Rowe Price U.S. Mid-Cap Growth Equity Trust, even though T. Rowe Price already offered an institutional version of the Mid-Cap Growth Fund that was cheaper than the trust.

94.     After these trusts had sufficient capital and investor interest to sustain operations without the Plan's assets, Defendant Trustees replaced the Plan's investment in these trusts with their cheaper institutional share class analogues.

95.     Defendant Trustees also added funds to the 401(k) Plan investment options that had no track-record on which they could have assessed the abilities of the funds' managers and strategy. For instance, the defunct T. Rowe Global Infrastructure Fund and the struggling T. Rowe Price Real Asset fund were added to the Plan shortly after their creation and before they had established any track-record.

42

**F.  Defendants Breached Their Fiduciary Duties of Prudence and Loyalty and Committed Transactions Prohibited by ERISA**

1.  401(k) Plan Trustees Failed to Correct the Breaches of Predecessor Fiduciaries

96.     At the inception of the Class Period, the 401(k) Plan exclusively held T. Rowe Price proprietary funds, and almost all of these were the expensive retail class versions of T. Rowe Price mutual funds.  The 401(k) Plan Trustees knew or should have known that their predecessor fiduciaries had breached their fiduciary duties of prudence and loyalty in selecting these funds for the 401(k) Plan.  The Trustees knew or should have known that, in many cases, alternative better performing and/or less costly non-proprietary investment funds were not considered and would have been superior and prudent choices for the Plan instead of the in-house funds that were selected.

97.     The Trustees also knew or should have known that less costly versions of these proprietary funds were available, such as institutional share classes of mutual funds and lower cost classes of collective investment trusts.  Even where lower cost versions were not available, the Trustees knew or should have known that they could have leveraged the Plan's size to negotiate the creation of Collective Investment Trusts or Separately Managed Accounts for the 401(k) Plan.  The Trustees also knew or should have known that their predecessor fiduciaries breached their duties by failing to sufficiently consider these alternatives and instead select them for the 401(k) Plan.

98.     Under ERISA, 401(k) Plan fiduciaries have an obligation to correct the breaches of predecessor fiduciaries.  Despite knowledge of the fiduciary breaches of their predecessors, the Defendant Trustees breached their fiduciary duties under ERISA by either failing to remedy

43

these breaches, or, in a few cases of offering expensive retail class versions of proprietary mutual funds, waiting too long to act to shift into lower cost versions of the funds.

2.   The Trustees' Imprudent and Disloyal Selection of 401(k) Plan Investment Options

99.   During the Class Period, the Defendant Trustees added many investment funds to the 401(k) Plan.  Without fail, all funds added were in-house T. Rowe Price funds.  In selecting and adding these funds, the Trustees failed to consider any non-proprietary alternatives.  Instead, they simply added in-house funds because doing so financially benefited T. Rowe Price and its subsidiaries.  The Trustees breached their duties of prudence and loyalty by failing to consider any comparable non-proprietary investment funds.[16]  The Trustees also breached their duties by, in certain cases, not selecting the lowest cost available version of in-house funds for the 401(k) Plan.

---

[16] The in-house funds added during the Class Period are the following.  Retail class mutual funds:  Global Allocation Fund, Global Industrials Fund, Asia Opportunities Fund, Ultra Short-Term Bond Fund, and Emerging Markets Corporate Bond Fund.  Institutional class mutual funds:  Mid-Cap Equity Growth Fund, Frontier Markets Equity Fund, Global Value Equity Fund, Global Multi-sector Bond Fund, Concentrated International Equity Fund, Floating Rate Fund, Global Growth Equity Fund, International Bond Fund, Long Duration Credit Fund, Core Plus Fund, Large Cap Value Fund, Emerging Markets Bond Fund, Global Focused Growth Equity Fund, High Yield Fund, Africa & Middle East Fund, Large Cap Growth Fund, Small Cap Stock Fund, Credit Opportunities Fund.  Collective Investment Trusts:   Retirement 2010 Active Trust, Retirement 2015 Active Trust,  Retirement 2020 Active Trust,  Retirement 2025 Active Trust, Retirement 2030 Active Trust,  Retirement 2035 Active Trust,  Retirement 2040 Active Trust, Retirement 2045 Active Trust,  Retirement 2050 Active Trust,  Retirement 2055 Active Trust, Retirement 2060 Active Trust, Blue-Chip Growth Trust T1, U.S. Bond Enhanced Index Trust, New Horizons Trust, Bond Trust I, U.S. High-Yield Trust, Blue-Chip Growth Trust T5, Capital Appreciation Trust D, International Growth Equity Trust D, Equity Income Trust D, Growth Stock Trust D, Small Cap Core Equity Trust D, Mid-Cap Growth Equity Trust D, Mid-Cap Value Equity Trust D, Small Cap Value Equity Trust D, Value Equity Trust D, Retirement Income Active Trust, Capital Appreciation Trust A, Emerging Markets Equity Trust A, Equity Income Trust A, Growth & Income Trust D, International Small Cap Equity Trust D, International Value Equity Trust D, New Horizons Trust A, International Core Equity Trust D, Real Assets Trust I D, Structured Research Trust B, Retirement Balanced Active Trust.

### 3.   The Trustees' Imprudent and Disloyal Investment Monitoring

100.    The Trustees had a fiduciary duty to loyally and prudently monitor the 401(k)

Plan investments' performance and fees, and the appropriateness of continuing to offer each

investment in the 401(k) Plan.

101.    The Trustees met multiple times per year to discuss the affairs of T. Rowe Price

employee benefit plans, including the 401(k) Plan.

102.    At these meetings, the appropriateness of the 401(k) Plan investment funds was

reviewed and monitored.  However, the monitoring was both disloyal and imprudent.  The

Trustees placed the financial interests of T. Rowe Price and its subsidiaries above those of 401(k)

Plan participants by favoring in-house funds, where the fees paid enriched T. Rowe Price

affiliates, and failed to consider whether those funds should be replaced with lower cost non-

proprietary funds.

### 4.   The Defendant T. Rowe Price Investment Affiliates' Fiduciary Breaches

103.     The Defendant T. Rowe Price Investment Affiliates, as fiduciaries and

investment advisers to the 401(k) Plan and its Trustees, were obviously conflicted when it came

to recommending or evaluating any of the in-house funds as 401(k) Plan investment vehicles

since they also served as the investment advisor to those funds, and received fees proportional to

the amount of assets invested in those funds.

104.    The T. Rowe Price Investment Affiliates breached their duties of prudence and

loyalty to participants by giving imprudent investment advice to the Trustees, advice that would

routinely be followed, in conjunction with monitoring, selection, and the appropriateness of

continuing to offer in-house funds for the 401(k) Plan.

105.     The Trustees knew the T. Rowe Price Investment Affiliates were conflicted but nevertheless relied on the T. Rowe Price Investment Affiliates' advice.

### 5.   The Appointing Fiduciary Defendants' Fiduciary Breaches

106.     The Appointing Fiduciary Defendants knew or should have known that the Trustees were breaching their ERISA fiduciary duties in committing prohibited transactions with respect to the 401(k) Plan, as detailed herein.  Rather than taking steps to remedy these violations, the Appointing Fiduciary Defendants welcomed and participated in the Trustees' ERISA violations.

### 6.   Defendants' Violations of ERISA's Prohibited Transaction Provisions

107.     As is discussed further below, Defendants' self-dealing conduct in causing the 401(k) Plan to be invested in in-house funds violated ERISA's prohibited transaction provisions, 29 U.S.C. §1106.

### 7.    Other Facts Relevant to Defendants' Breaches

108.     401(k) Plan participants, including the named Plaintiffs, do not have access to minutes or other information regarding the proceedings of the 401(k) Plan Trustees or any other Defendant fiduciaries in making investment decisions with respect to the Plan (including Defendants' processes and motivations for selecting, monitoring, evaluating and removing Plan investments), because this information is solely within the possession of Defendants. Accordingly, Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties, and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.

# V.    CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this action on behalf of:

> All participants and beneficiaries in the T. Rowe Price U.S. Retirement
> Program from February 14, 2011 through the date of judgment.  Any
> individual Defendants, their beneficiaries, and their immediate
> families are excluded from the class.

110.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1) and/or

(b)(3).

111.    The class satisfies the numerosity requirement because it is composed of

thousands of persons.  The 401(k) Plan has more than 8,000 participants.  The number of class

members is so large that joinder of all its members is impracticable.

112.    Common questions of law and fact include:

A.    Whether the Trustees were ERISA fiduciaries responsible for monitoring

401(k) Plan investments;

B.     Whether the Defendant T. Rowe Price Investment Affiliates were ERISA

fiduciaries and investment advisers to the 401(k) Plan;

C.    Whether the Appointing Fiduciary Defendants were ERISA fiduciaries to

the 401(k) Plan with the responsibility for monitoring the performance of the Trustees in

managing Plan investments;

D.    Whether the Trustees and the T. Rowe Price Investment Affiliates

breached their ERISA fiduciary duties in monitoring the investment options in the 401(k)

Plan;

E.    Whether the Trustees and the T. Rowe Price Investment Affiliates

breached their ERISA fiduciary duties in selecting investment options for the 401(k)

Plan; and

47

F.      Whether the 401(k) Plan and its participants suffered losses as a result of the Defendants' fiduciary breaches.

113.    Plaintiffs' claims are typical of the claims of the Class.  They have no interests that are antagonistic to the claims of the Class.  They understand that this matter cannot be settled without the Court's approval.

114.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous representation of the Class.  Plaintiffs' counsel are McTigue Law LLP ("McTigue Law") and Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein").  For over two decades, McTigue Law has devoted its practice principally to protecting ERISA plan participants by litigating civil enforcement class actions alleging the mal-investment of ERISA plan assets.  It has been appointed lead or co-lead counsel in numerous cases, many of which involved cutting edge legal issues.  The founder, Brian McTigue, worked for a decade for the U.S. House of Representatives and Senate investigating pension fund mal-investment.  Before that, Mr. McTigue was an award-winning investigative reporter whose work involved pension fund investment.  Cohen Milstein's Employee Benefits Practice Group has been devoted exclusively to litigating complex ERISA class actions for over 15 years. The group, led by Karen L. Handorf, has played a significant role in the development of employee benefits law, and maintains a leading ERISA practice that successfully represents ERISA participants throughout the country.

115.    Plaintiffs' counsel have agreed to advance the costs of the litigation contingent upon the outcome.  Counsel are aware that no fee can be awarded without the Court's approval.

116.    A class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the class is impracticable.  The losses suffered by some

48

of the individual members of the class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Moreover, Defendants, as 401(k) Plan fiduciaries, were obligated to treat all class members similarly, i.e. as Plan participants governed by written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.  Plaintiffs are unaware of any difficulty in the management of this action as a class action.

117.    This Class may be certified under Rule 23(b).

A.    23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants, or (B) adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.    23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter.

# VI.   CLAIMS FOR RELIEF

## COUNT I

**Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring and Selection of 401(k) Plan Investments during the Class Period, which Caused Losses to the 401(k) Plan**
**(Violation of ERISA, 29 U.S.C. §1104 by the 401(k) Plan Trustees)**

118.    All previous averments are incorporated herein.

119.    At all relevant times, the 401(k) Plan Trustees were fiduciaries within the meaning of ERISA, 29 U.S.C. §1002(21)(A), by exercising authority and control with respect to the management of the 401(k) Plan and its assets.

120.    The Trustees had an ongoing duty to loyally and prudently monitor and select 401(k) Plan investments.

121.    The Trustees breached their duties of prudence and loyalty under ERISA, 29 U.S.C. §§1104(a)(1)(A), (B) by disloyally and imprudently monitoring and selecting 401(k) Plan investment options during the Class Period.  The Trustees breached their duties by employing disloyal and imprudent monitoring processes.  They gave preferential treatment to the in-house funds because maintaining those funds in the 401(k) Plan financially benefited T. Rowe Price and its subsidiaries, since it generated millions of dollars in fee income for the T. Rowe Price Investment Affiliates.

122.    The Trustees also breached their duties of prudence and loyalty by selecting and/or failing to replace higher cost retail versions of the in-house funds, when lower cost versions, specifically either institutional share classes or collective trusts, were available.  To the extent the Trustees replaced retail share classes with lower cost versions with respect to some of the funds during the Class Period, they breached their duties by not doing so earlier.

123.     As a direct and proximate result of these breaches of duty, the Plan, and indirectly

Plaintiffs and the Plan's other participants, realized losses.

124.     Pursuant to ERISA, 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), the

Committee Defendants are liable to restore all losses suffered by the Plan caused by the

Committee Defendants' breaches of fiduciary duty.

## COUNT II

**The Appointing Fiduciary Defendants Breached their ERISA Fiduciary Duties by Failing to Remove and Prudently Monitor the 401(k) Plan Trustees**

125.     All previous averments are incorporated herein.

126.     At all relevant times the Appointing Fiduciary Defendants (T. Rowe Price, its

Management and Management Compensation Committees and their individual members) were

401(k) Plan fiduciaries within the meaning of ERISA, 29 U.S.C. §1002(21)(A), by exercising

authority and control with respect to appointment, removal (if necessary), and monitoring of the

Trustees in the performance of their fiduciary duties.

127.     The Appointing Fiduciary Defendants violated their ERISA fiduciary duties of

prudence and loyalty by failing to adequately monitor the performance of the Trustees when the

Appointing Fiduciary Defendants knew or should have known that the Trustees were failing to

fulfill their ERISA fiduciary obligations.  In particular, the Trustees were breaching their duties

of loyalty and prudence by exclusively offering in-house funds in the 401(k) Plan, and failing to

consider lower cost and better performing non-proprietary alternatives.

128.     As a direct and proximate result of these breaches of fiduciary duty, the 401(k)

Plan, and indirectly Plaintiffs and the 401(k) Plan's other participants, lost tens of millions of

dollars in retirement savings.

## COUNT III

**Breach of Duties of Loyalty and Prudence by Providing Imprudent and Self-Interested Investment Advice to Committee Defendants
(Violation of ERISA, 29 U.S.C. §1104 by Defendants T. Rowe Price Associates and T. Rowe Price Trust (Defendant "T. Rowe Price Investment Affiliates"))**

129.     All previous averments are incorporated herein.

130.     At all relevant times, Defendant T. Rowe Price Investment Affiliates were fiduciaries of the 401(k) Plan in that they regularly provided investment advice to the 401(k) Plan Trustees that was a principal basis for the Trustees' investment decisions with respect to the 401(k) Plan.  The T. Rowe Price Investment Affiliates were indirectly compensated for this advice via the fees they received on 401(k) Plan assets invested in the in-house funds.

131.     Defendant T. Rowe Price Investment Affiliates were required by ERISA to provide prudent and loyal advice to the Trustees regarding 401(k) Plan investment options that put the interests of 401(k) Plan participants first and foremost.

132.     Rather than providing such advice, Defendant T. Rowe Price Investment Affiliates provided self-interested and imprudent advice that benefited their own investment management business – both financially and in terms of reputation.

133.     As a direct and proximate result of these breaches of duty, the 401(k) Plan, and indirectly Plaintiffs and the 401(k) Plan's other participants, realized losses.

134.     Pursuant to ERISA, 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), Defendant T. Rowe Price Investment Affiliates are liable to restore all losses suffered by the 401(k) Plan caused by their breaches of fiduciary duty, and to disgorge all fees paid to them as a result of investment 401(k) Plan assets in the in-house funds during the Class Period.

## COUNT IV

### Liability for Breach of Co-Fiduciary
### (Liability Pursuant to ERISA, 29 U.S.C. §1105 of the Appointing Fiduciary Defendants and Defendants T. Rowe Price Associates and T. Rowe Price Trust (Defendant "T. Rowe Price Investment Affiliates"))

135.    All previous averments are incorporated herein.

136.    As a fiduciary of the 401(k) Plan, the Appointing Fiduciary Defendants assumed a duty to protect the Plan from the improper actions of other Plan fiduciaries.  A co-fiduciary is liable for the breach of another co-fiduciary under ERISA, 29 U.S.C. §1105, if he either knowingly participates in or conceals another fiduciary's breach of duty, or fails to make reasonable efforts under the circumstances to remedy the breach of another fiduciary when he has knowledge of the breach.

137.    The Appointing Fiduciary Defendants are liable as co-fiduciaries because they were aware of, participated in, enabled, concealed, and failed to remedy the Trustees' breaches of fiduciary duty, as described above, related to their monitoring, selection of, and failure to remove, the in-house funds as 401(k) Plan investments.

138.    Defendant T. Rowe Price Investment Affiliates knowingly participated in and enabled the Trustees' breaches of fiduciary duty in monitoring and selecting the in-house funds by repeatedly advising, as discussed above, selection and retention of the in-house funds.  The T. Rowe Price Investment Affiliates gave this advice because they benefited financially and in terms of promotion and reputation of their investment management business if the in-house funds were selected for, and were retained in, the 401(k) Plan.

139.    As a direct and proximate result of the Appointing Fiduciary Defendants and the T. Rowe Price Investment Affiliates' actions, the Plan and its participants lost tens of millions of

53

dollars.  Pursuant to ERISA, 29 U.S.C. §§1132(a)(2) & 1109(a), the Appointing Fiduciary

Defendants and the T. Rowe Price Investment Affiliates are liable to restore all losses to the Plan

caused by the breaches of their co-fiduciaries.

## COUNT V

### Liability for Failing to Remedy Breach of Predecessor Fiduciaries
### (ERISA Violation Against the 401(k) Plan Trustees)

140.    All previous averments are incorporated herein.

141.    A fiduciary has a continuing duty to remedy breaches of predecessor fiduciaries,

including breaches in the selection of investments.

142.    Prior to the inception of the Class Period, 401(k) Plan fiduciaries selected

numerous investment options for the 401(k) Plan, all of them were in-house funds, and almost all

of them were the most costly retail share class of those funds.

143.    Those funds were disloyally selected because, on information and belief, they

were chosen because their presence in the 401(k) Plan financially benefited T. Rowe Price and

its affiliates.  They were also chosen with no or inadequate consideration of alternatives.  401(k)

Plan fiduciaries thus breached their duties in selecting these funds for the 401(k) Plan.

144.    Plaintiffs do not currently know the names of those Trustees who are successor

fiduciaries to those fiduciaries who selected in-house funds prior to the Class Period.  Their

names will be supplied through discovery.  Henceforth, they will be referred to as the "Successor

Fiduciary Defendants."

145.    The Successor Fiduciary Defendants were aware that their predecessor fiduciaries

had breached their duties in selecting the in-house funds.

146.     The Successor Fiduciary Defendants breached their duties by failing to take adequate steps to remedy, within the Class Period, their predecessors' breaches in selecting the in-house funds.  Such steps could have included a full, unbiased, review of alternatives to the in-house funds for the Plan, and consideration of replacing them lower cost and/or better performing alternative investments.

147.     As a result of the Successor Fiduciary Defendants' breaches, the Plan and its participants lost tens of millions of dollars.

## COUNT VI

**Liability for Committing Prohibited Transactions
in Violation of ERISA, 29 U.S.C. §1106
(Against the 401(k) Plan Trustees and Defendants T. Rowe Price Associates and T. Rowe
Price Trust (Defendant "T. Rowe Price Investment Affiliates")))**

148.     All previous averments are incorporated herein.

149.     ERISA's fundamental fiduciary duties of loyalty and prudence are supplemented by express prohibitions of categories of transactions specified in 29 U.S.C. §1106.  Engaging in such transactions is considered a *per se* violation because they entail a high risk for abuse.  The two main types of prohibited transactions are: (1) transactions between the plan and parties-in-interest to the plan, such as persons or entities affiliated with the Plan's fiduciaries, service

providers, or associated parties,[17] and (2) transactions in which fiduciaries benefit themselves or a party with interests adverse to the plan.[18]

150.    At all relevant times, Defendant 401(k) Plan Trustees and Defendant T. Rowe Price Investment Affiliates were 401(k) Plan fiduciaries.  In addition, they were all parties-in-interest to the 401(k) Plan, as that term is defined in 29 U.S.C. §1002(14).

151.    The Trustee Defendants and Defendant T. Rowe Price Investment Affiliates, by their actions and omissions, throughout the Class Period, in causing the 401(k) Plan to be invested in the in-house funds, and in causing the 401(k) Plan to pay, directly or indirectly, on a monthly basis, investment management and other fees to the T. Rowe Price Investment Affiliates in connection therewith, caused the 401(k) Plan to engage in transactions that these Defendants knew or should have known constituted sales or exchanges of property between the 401(k) Plan and parties in interest, furnishing of services between the Plan and a party-in-interest for more than reasonable compensation, transfer of Plan assets to a party-in-interest, and transactions between a Plan and its fiduciaries in violation of 29 U.S.C. §§1106(a)(1)(A), (C), (D), and 1106(b).

---

[17] *See* 29 U.S.C. §1106(a)(1) which provides, in pertinent part: "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, or any property between the plan and party-in-interest; … (C) furnishing of goods, services, or facilities between the plan and a party-in-interest; (D) transfer to, or use by or for the benefit of a party-in-interest, of any assets of the plan…".

[18] *See* 29 U.S.C. §1106(b) which provides, in pertinent part: "a fiduciary with respect to the plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

152.     As a direct and proximate result of these prohibited transaction violations, the

401(k) Plan, directly or indirectly, paid millions of dollars in investment management and other

fees that were prohibited by ERISA and suffered tens of millions of dollars in losses.

153.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), these Defendants are liable to

restore all losses suffered by the 401(k) Plan as a result of the prohibited transactions and

disgorge all revenues received and/or earned from the fees paid out of 401(k) Plan assets, as well

as other appropriate equitable relief

## COUNT VII

**Other Equitable Relief Based on Ill-Gotten Proceeds
In Violation of ERISA, 29 U.S.C. § 1132(a)(3)
(Against T. Rowe Price and Defendants T. Rowe Price Associates and T. Rowe Price Trust
(Defendant "T. Rowe Price Investment Affiliates"))**

154.     All previous averments are incorporated herein.

155.     Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable

relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under this

section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is

subject to equitable relief if it had actual or constructive knowledge of the circumstances that

rendered the transaction or payment unlawful.

156.     The T. Rowe Price and T. Rowe Price Investment Affiliates profited from the

Plan's investments in T. Rowe Price proprietary funds.

157.     All payments to T. Rowe Price Investment Affiliates made in connection with

Plan assets are in the current possession of T. Rowe Price or T. Rowe Price Investment

Affiliates, and are traceable to specific transactions that have taken place on specific dates.

158.     Pursuant to 29 U.S.C. § 1132(a)(3), T. Rowe Price and T. Rowe Price Investment

Affiliates should be required to disgorge all monies they have received during the Class Period as a result of the Plan's investments in T. Rowe Price proprietary funds. The selection and retention of these proprietary mutual funds was imprudent and violated ERISA based on the facts set forth in this First Amended Complaint, and also constituted prohibited transactions with a party-in-interest and a fiduciary. Additionally, T. Rowe Price and T. Rowe Price Investment Affiliates had actual or constructive knowledge of circumstances rendering the selection and retention of these proprietary funds (and the payments that T. Rowe Price and T. Rowe Price Investment Affiliates received from these proprietary funds) unlawful, by virtue of:

(a) the Committee members with executive positions at multiple T. Rowe Price entities;

(b) other dual-hatted employees;

(c) T. Rowe Price and T. Rowe Price Investment Affiliates' participation in the Plan as employers with employees in the Plan; and

(d) T. Rowe Price and T. Rowe Price Investment Affiliates' general operational interconnectedness.

159.    In light of the above facts and other facts likely to be revealed through discovery, T. Rowe Price and T. Rowe Price Investment Affiliates had actual or constructive knowledge of the process for selecting and monitoring the investments in the Plan, and knew that this process was designed to enrich T. Rowe Price and T. Rowe Price Investment Affiliates at the expense of Plan participants. T. Rowe Price and T. Rowe Price Investment Affiliates knew that the proprietary investments in the Plan were excessively costly and performed poorly in comparison to other investment alternatives. T. Rowe Price and T. Rowe Price Investment Affiliates also had knowledge of each entity's fiduciary and/or party-in-interest status, and the circumstances that rendered the payment of fees to these entities prohibited transactions.

160.     Given their knowledge of these fiduciary breaches and prohibited transactions, T. Rowe Price and T. Rowe Price Investment Affiliates entities had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of violations of ERISA by the Defendant Trustees and others.

161.     Therefore, to the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to disgorge these monies from T. Rowe Price and T. Rowe Price Investment Affiliates under principles of unjust enrichment and equitable restitution.

WHEREFORE, Plaintiffs pray for relief as follows:

a)     Certify this action as a class action pursuant to Fed. R. Civ. P. 23;

b)     Issue an order removing Defendants from their positions of fiduciary responsibility with respect to the 401(k) Plan;

c)     Issue an order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' fiduciary breaches and prohibited transactions, including lost return on investments and payment of high fees for investments;

d)     Order equitable restitution, disgorgement of all fees paid, and other appropriate equitable monetary relief against Defendants;

e)     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations and duties;

f)     Award Plaintiff and the class their attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

g)     Award such other and further relief as the Court deems equitable and just.

DATED: July 20, 2017                 Respectfully Submitted,


By:   /s/ Mikael S. Neville
J. Brian McTigue (Admitted *Pro Hac Vice*)
James A. Moore (Admitted *Pro Hac Vice*)
Mikael Neville (USDC D. of MD Bar No. 19855)
**MCTIGUE LAW LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC  20016
Tel:  (202) 364-6900
Fax: (202) 364-9960
bmctigue@mctiguelaw.com
jmoore@mctiguelaw.com
mneville@mctiguelaw.com

**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Karen L. Handorf (Admitted *Pro Hac Vice*)
Scott M. Lempert (Admitted *Pro Hac Vice*)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005
Tel: (202) 408-4600
Fax: (202) 408-4699
khandorf@cohenmilstein.com
slempert@cohenmilstein.com

*Counsel for Plaintiffs*

60