# Exhibit 1

MCTIGUE LAW LLP
4530 Wisconsin Avenue, NW
Suite 300
Washington, D.C. 20016
(202) 364-6900
Fax: (202) 364-9960

January 4, 2018

**Via Email**
Brian D. Boyle
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

    Re:    *Feinberg v. T. Rowe Price Group, Inc.* **(1:17-cv-427)**

Dear Brian,

    In preparation for a conference on discovery of electronically stored information ("ESI"), below is Plaintiffs' proposed search term and list of document custodians for an initial search. Also accompanying this letter is a proposed ESI protocol. While the deadline for an ESI conference is January 11, we see no reason the parties cannot come to an agreement on ESI prior to the conference deadline.

    The list of proposed custodians is included as Attachment A. We believe the individuals listed are likely to have documents relevant to this lawsuit. Searches should include those assisting these individuals who have also received or prepared documents on their behalf or at their direction, such as assistants, secretaries, and other staff. Further, to the extent that any of the Defendant entities also generated and stored electronic documents in a manner that is not specific to individuals, e.g. via an entity email address, searches should include such non-individual custodians. To facilitate such a search, a list of T. Rowe Price entities currently known to Plaintiffs and relevant to this case is also included in Attachment A. Moreover, in a couple of instances, Plaintiffs do not currently know the names of proposed custodians, but describe the roles they play. Plaintiffs expectation is that Defendants will identify these individuals and reveal the names to Plaintiffs prior to any search.

    Regarding locations, plaintiffs have no knowledge of how and where Defendants generate and store electronic documents. Generally, however, we would expect a search for electronic documents to include email and document servers, cloud storage, local drives, and personal devices used by custodians.

    As is further described in the attached proposed protocol, Plaintiffs believe the most efficient way to proceed, once the parties have agreed on custodians and search terms, would be for Defendants to provide Plaintiffs with the results of a trial run, indicating the number of documents the search retrieves, as well as the number of unique documents that are attributable to which search terms. The parties can then decide whether and how to narrow the search, if necessary.

1

Plaintiffs' proposed search term is below (where "/" represents "or"). The basic idea is that the first paragraph will find documents relating to the T. Rowe Price U.S. Retirement Program, while the second paragraph further narrows the search to documents concerning investments, fees, or documents otherwise relevant to the litigation:

(401k/401(k)/"defined contribution"/"dc plan"/"retirement program"/"U.S. Retirement"/"US Retirement"/"U. S. Retirement"/"U S Retirement"/"U.S.Retirement"/"USRetirement")

**and**

(trustee/"management committee"/hardwir/"hard wir"/hard-wir/invest/fund/fee/expense/cost/compensat/revenue/profit/perform/fiduciar/trustee/menu/bp/ "basis point"/in-house/"in house"/inhouse/scorecard/"score card"/"report card"/"reportcard"/trailing/option/asset/manager/affiliate/policy/policies/"watch list"/watchlist/proprietary/negotiat/diligen/pruden/conflict/risk/lawsuit/rfp/ERISA/Vanguard/ "money market"/benchmark/"bench mark"/index/indices/"rate of return"/"rates of return"/minutes/lineup/menu/monitor/IPS/"large cap"/largecap/"mid cap"/midcap/"small cap"/ smallcap/"fixed income"/equity/equities/"S&P 500"/bond/ Fidelity/"securities services"/audit/ "corporate benefits"/compliance/legal/litigat/advice/advise/discretion/law/Lipper/ Morningstar/"morning star"/M*/"fi 360"/fi360/"collective investment trust"/"collective trust"/CIT/CTF/"common investment"/"common trust"/"separate account"/"seed"/"best practice"/PT/PTE/"prohibited transaction"/408b2/ 408(b)(2)/77-3/selfdealing/"self dealing"/self-dealing/labor/DOL/15(c)/15c)

The search for the terms above should find any and all occurrences of the character sequence forming the term (i.e. regardless of what characters or spaces precede or follow them) and be case insensitive. We reserve our right to modify this proposal once we receive further details regarding your proposed search software, as is required under the proposed ESI protocol.

We hope to discuss our proposal with you at your earliest convenience.

Sincerely,
/s/James A. Moore

cc (via email):
Scott M. Lempert

**ATTACHMENT A**

INDIVIDUALS

| Name (if known) | Identifying Notes |
|---|---|
| 1. Larry Puglia | Chair of 401(k) Plan trustee committee |
| 2. Ken Moreland | Former 401(k) Plan trustee & TRP CFO |
| 3. Preston Athey | 401(k) Plan trustee & fund portfolio manager |
| 4. Steve Banks | 401(k) Plan trustee |
| 5. Meredith Stewart | 401(k) Plan trustee |
| 6. Gretchen Park | 401(k) Plan trustee meeting attendee |
| 7. Francisco Negron | 401(k) Plan trustee meeting attendee |
| 8. Nancy Maitland | 401(k) Plan trustee meeting attendee |
| 9. Barbara O'Connor | 401(k) Plan trustee meeting attendee |
| 10. Margaret Raymond | ERISA attorney & 401(k) Plan trustee meeting attendee |
| 11. Bill Stromberg | Named Defendant and member of the Management Committee & CEO since 2016; Met with some Trustees to discuss 401(k) Plan funds |
| 12. Brian C. Rogers | Named Defendant, member of the Management Committee, Chairman of the Board Of Directors, Chief Investment Officer |
| 13. John Linehan | Named Defendant and member of the Management Committee; met with some Trustees to discuss 401(k) Plan funds |
| 14. James A.C. Kennedy | Named Defendant and member of the Management Committee & CEO prior to 2016; signed Am. 2 to 2012 401(k) Plan document |
| 15. Clay Bowers | 401(k) Plan trustee meeting attendee |
| 16. Eric Veiel | Named Defendant and member of the Management Committee; Met with some Trustees to discuss 401(k) Plan funds |
| 17. Mike McGonigle | 401(k) Plan trustee |
| 18. Lisa Hanes | Product Fund Management employee |
| 19. Craig Keim | 401(k) Plan trustee meeting attendee |
| 20. Names currently unknown | Chair or chairs of the Mgt. Comp. Committee circa 10/15-the present |
| 21. Names currently unknown | Chair or chairs of any sub-committee the TRP Board of Directors from 2/14/11 through 6/30/14 that had oversight over 401(k) Plan amendments, administration, or governance |

ENTITIES

| | | |
|---|---|---|
| 1. | T. Rowe Price U.S. Retirement Program Trustee Committee | |
| 2. | T. Rowe Price Group, Inc. Management Compensation Committee | |
| 3. | T. Rowe Price Group, Inc. Management Committee | |
| 4. | T. Rowe Price Group, Inc. Board of Directors | |

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| David G. Feinberg, et al., | Case No:  17-cv-00427-JKB |
| Plaintiffs, | **PROTOCOL FOR TREATMENT OF ELECTRONICALLY STORED INFORMATION ("ESI") IN DISCOVERY** |
| vs. | |
| T. Rowe Price Group, Inc., et al., | |
| Defendants. | |

The Parties agree to the following protocol for electronic discovery:

A. **SCOPE**:  The procedures in this agreement shall govern the production of responsive documents, including electronically stored information, in this matter, unless the Parties otherwise agree in writing or they are changed by the Court.  The Parties do not waive any objections to the production, discoverability, or confidentiality of documents.  This agreement shall be a supplement to the Federal Rules of Civil Procedure, this Court's guidelines for the discovery of electronically stored information, and any other applicable orders and rules.

B. **DEFINITIONS**

   1. **"Document"** or **"documents"** means any of the items referenced in Fed. R. Civ. P. 34(a)(1)(A), which includes both ESI and hard copies.

   2. **"Electronically stored information"** or **"ESI"** means electronically accessible information stored in or on any storage media in or on computers, file servers, disks, tape, magnetic or optical drives, or other devices or media, as such information is defined in the Federal Rules of Civil Procedure, including Rule 34(a).

   3. **"Extracted Text"** means the text extracted from a Native Format file and includes at least all header, footer and document body information.

   4. **"Load File"** means an electronic file that is used to import all required production information into a document database, including document images, extracted and/or OCR text, native files where required, and metadata, as well as information indicating document and page breaks, and document relationships such as those between an email and its attachments and a document and information related to embedded content.

   5. **"Metadata"** means structured information about ESI that is created by the file system or application, embedded in the document and sometimes modified through ordinary business use. Metadata includes data regarding the characteristics, origins, usage and validity of the collected ESI.

   6. **"Media"** means an object or device, whether or not in the Producing Party's physical

possession, on which data is or was stored.

7. **"Native Format"** means the format in which a document was generated and/or used by the Producing Party.

8. **"OCR"** means the optical character recognition technology used to make unsearchable documents searchable. The searchable text is also referred to as "OCR text" or simply "OCR."

9. **"Parties"** means the Plaintiffs and Defendants in this case.

10. **"Producing Party"** means the party that produces documents.

11. **"Receiving Party"** means the party to whom documents are produced.

12. **"Responsive Document"** means any document that is responsive to any discovery request served in this case.

13. **"Tagged Image File Format"** or **"TIFF"** refers to the CCITT Group IV graphic file format for storing bit-mapped images of ESI or paper documents.

C. **SCHEDULE FOR AGREEING TO SEARCH PARAMETERS, CUSTODIANS, AND PRODUCING ESI**

1. **Effect of Electronic Searches on Discovery Obligations.** The fact that a document falls within the scope of agreed search terms shall not prevent a Party from withholding it from production for lack of responsiveness or other permissible objection. Moreover, to the extent any Party is aware of responsive documents not within the scope of an agreed search, all such documents must be produced, subject to the Parties' objections to discovery requests.

2. **Schedule.** The Parties shall endeavor to respond in a timely fashion to all requests for documents and ESI, and abide by the following schedule:

   **a. Initial Identification of Search Terms and Custodians**. Within *seven days* of the date of this Agreement, each Producing Party shall provide to the other party:

   i. An initial list of (1) custodians or shared locations likely to possess relevant ESI, along job title and a summary of his/her primary responsibilities, (2) proposed keyword search terms for the Producing Party's searches of its own ESI, and (3) any proposed exclusion criteria (e.g. date restrictions).

   ii. A list of the data sources it intends to search for ESI, along with any data sources that it expects would contain responsive ESI but which it does not intend to search because the sources are not reasonably accessible or because the relevant data is reliably identifiable by manual search.

   iii. Organizational charts relating to departments within its organization in which any identified custodians work.

**b. Meeting and Conferring on Search Terms and Custodians**. Within *ten days* after the Agreement Date, the Parties shall meet and confer regarding the aforementioned search terms and custodian lists. A Producing Party may test the efficacy of proposed search terms by assessing hit reports and/or by sampling individual query results or cumulative results, and during the meet and confer process may support the exclusion of disputed search terms by reference to such statistical hit reporting and/or intelligence garnered from such sampling, provided, however, that if a Party relies upon such statistical hit reporting and/or intelligence for the exclusion of certain search terms it must first provide to the Requesting Party the underlying "hit rate data" (i.e., total number of documents searched, number of aggregate hits, number of unique hits, etc.) relating to such search terms.

**c. Search Software Disclosures:** Within *ten days* after the Agreement Date, the producing Parties will disclose the identity of any proposed search software (including version number) and its search syntax, including default stop/noise words. The Parties should use best efforts to answer the following questions regarding the software:

   a. What stop words have been excluded from the index (if different than the default stop words for the tool)?

   b. Can searches be constrained by upper- and lowercase?

   c. Can numbers and single letters be searched?

   d. Are there characters that cannot be searched or are treated as spaces or ignored?

   e. How are diacritics resolved?

   f. Can searches be run on metadata fields?

   g. Are proximity-limited search terms subject to an evaluation order, e.g., will terms structured X w/5 Y yield hits if the text reads Y w/5 X?

   h. Does the tool offer synonym searching?

   i. How does the tool account for common misspellings?

**d. Commencement of ESI Production**. Within *14 days* of the Agreement Date, each Party shall:

   **i. Begin collecting documents in the possession of custodians or shared locations** (the "Gathered Documents"). (Through the pendency of the litigation, each Party is obligated to retain documents in the possession of each Disputed Custodian or source, but is prohibited from using a document in this Litigation not produced from an Agreed Custodian).

   **ii. Run the agreed search on all Gathered Documents**. This step shall not await the resolution of any remaining Disputed Custodians and/or Disputed Terms.

> The documents resulting from this process (the "Collected Documents") shall be set aside to be reviewed for production in accordance with the litigation schedule set by the Court.
>
> **iii. The Parties will continue to meet and confer with respect to any Disputed Custodians and/or Disputed Terms**, and any custodians or terms upon which they reach agreement shall be added to the Agreed Custodian or Agreed Term lists. Gathered Documents will then be identified from any new custodians and searched in accordance with the provisions of this methodology.
>
> **iv.** The Parties agree to meet and confer to discuss identification of any relevant documents not identified by the keyword search methodology.

**e. If, thirty days after the Agreement Date, Disputed Terms or Disputed Custodians remain, the Parties will submit those terms to the Judge via a joint discovery letter**. (If a Party intends to rely upon any "hit rate" data to justify its refusal to run a search for any Disputed Terms, then that Party must supply, for each Disputed Term for which it is relying upon "hit rate data", the following information: (i) the number of documents searched, (ii) the number of aggregate hits for each Disputed Term, and (iii) the number of unique hits for each Disputed Term).

**f. Additional searches**. In accordance with the overall litigation schedule set by the Court, each Party may, upon reviewing documents actually produced in the Litigation, and conducting other investigation and discovery, request that files from additional custodians be searched and/or that existing custodians be re-searched using additional search terms. The Parties agree to meet and confer in good faith concerning any such requests.

### D.  DE-DUPLICATION & PRODUCTION FORMAT FOR ESI AND PAPER DOCUMENTS

**1.**  The Parties shall produce paper documents and ESI according to the specifications provided in Exhibit A.

**2.  De-Duplication.** A Party shall use reasonable efforts to remove exact duplicate ESI according to the MD5/SHA-1 hashing method specified in Exhibit A and shall provide the additional information about custodians of de-duplicated documents specified in Exhibit A.

However:

(i) de-duplication shall be performed only at the document family level so that attachments are not de-duplicated against identical stand-alone versions of such documents and vice-versa, although each family member shall be hashed separately for purposes of populating the Fingerprint field in Exhibit A;

(ii) attachments to e-mails or other documents shall not be disassociated from the parent e-mail or document even if they are exact duplicates of another document in the production; and

(iii) paper documents shall not be eliminated as duplicates of responsive ESI.

ESI that is not an exact duplicate according to the method specified in Exhibit A may not be removed. The Parties shall make every effort to reach agreement on any culling criteria to be used, including but not limited to de-NIST criteria, date ranges, and file type inclusion/exclusion.

3. **Encryption.** The Parties will make reasonable efforts to ensure that all encrypted or password-protected documents are successfully processed for review and production under the requirements of this Agreement, and if produced in native form, the decrypted document is produced.

(To the extent encrypted or password-protected documents are successfully processed according to the requirements of this Agreement, the Parties have no duty to identify their prior encrypted status. To the extent such documents are not successfully processed despite use of reasonable efforts, including reasonable efforts to obtain passwords, the Producing Party agrees to produce an inventory of such files that are determined to have a reasonable likelihood of containing relevant information as is apparent without decryption such as attachments to responsive files, or metadata suggestive of responsiveness, such as relevant file names, and in any case shall include any container files such as PST or ZIP files. The inventory shall contain any required metadata and document identifying information, including family relationships, to the extent that such information can be extracted using reasonable efforts during document processing. The inventory shall be produced in accordance with the Load File specifications provided in Exhibit A. Each Party may request production of such encrypted files, as well as a written description of the efforts undertaken by the Producing Party to decrypt the file, according to the procedure specified for requesting production of ESI in Native Format, and such requests will not be unreasonably denied.)

4. **Documents to Be Produced Natively**. Spreadsheet files, personal (non-enterprise) database files, video and audio files, animation files PDF files, and any other ESI that is not accurately represented in TIFF format shall be produced in Native Format.

If a document to be produced in Native Format contains privileged information, the document will be produced by producing the document in TIFF format with redactions. To the extent documents that fall under this paragraph contain privileged information and cannot be redacted or produced in TIFF format, such documents will be logged on a privilege log. The production load files shall contain a link to the produced Native Files as specified in the ''Native Link" metadata field described in Exhibit A.

To the extent a response to discovery requires production of discoverable electronic information contained in an enterprise database (as opposed to Microsoft Access and similar personal database files), the Parties shall discuss the production scope and format prior to production.

Each electronic file produced in Native Format shall be assigned a unique Document Number, and the database record for that file shall include a single-page TIFF image branded with this unique Document Number in the lower right corner of the image as a Bates number, with the phrase "PRODUCED IN NATIVE FORMAT" (or similar language) branded in the center of the page. To protect the confidentiality of files produced in Native Format, any confidentiality designations pursuant to the Stipulated Protective Order must appear on the associated TIFF placeholder on the lower left-hand corner in no less than 10-pt font.

Files produced in Native Format shall be given file names identical to the Document number, followed by the file extension and include the confidentiality designation after the file number, e.g., US00000000_CONF.xis or US00000000_HIGHCONF. For each file produced in Native Format, Producing Party shall also indicate its native status in the NativeFile metadata field described in Exhibit A.

5. **Production of Additional Documents in Native Format.** Each Party reserves the right to request production of ESI in Native Format for any ESI that is not adequately represented in the TIFF format specified in Exhibit A, and such requests will not be unreasonably denied.

6. **Non-responsive Attachments or Parent Documents.** The parties agree that no attachments to responsive parent documents, and no parent documents with responsive attachments, will be withheld from production solely on the ground that, considered alone, they are not responsive.

7. **Unitization.** In scanning paper documents, each page of paper should be output to a single page TIFF file. Distinct, logical document breaks should be defined as such in a standard Opticon load file as described in Exhibit A. In the case of an organized compilation of separate documents--for example, a binder containing several separate documents behind numbered tabs--the document behind each tab should be scanned separately, but any document or family relationship among the scanned documents in the compilation should be reflected in the data load file at the appropriate standard fields. Pages containing post-it notes or other detachable notes that obscure the underlying document should be scanned once with the detachable note intact, and then again without it, and made part of the same document. The Parties will make their best efforts to unitize the documents correctly.

8. **Embedded Files.** If a document has information from another file embedded in it, (e.g., a Word document that has a spreadsheet embedded in it), the Producing Party shall produce the document with all embedded information, and the Receiving Party may request that the embedded file be produced as a standalone file. The Producing Party shall promptly respond in writing if it cannot produce the requested embedded file as a standalone file, after which the Parties shall meet and confer. **Metadata Fields and Processing.** Each of the metadata and coding fields set forth in Exhibit A that can be reasonably extracted from a document shall be produced for that document. The parties are not obligated to populate manually any of the fields in Exhibit A if such fields cannot be extracted from a document and its context in the source data, with the exception of the following: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach fields, (e) Custodian, (f) Paper (YIN), (g) Redacted (YIN), (h) Confidentiality, (i) NativeFile (YIN), (j) ProdVolume, (k) ParentBates, and (l) AttachBates.

E. **COLLECTION AND PROCESSING OF ESI**

The Producing Party shall collect and process documents using forensically sound methods that avoid spoliation of data. The Producing Party shall use the following specifications when converting ESI from its Native Format into TIFF image files prior to its production:

1. All ESI shall be processed with a single time zone and a date and time setting that is consistent across all Defendant productions, and across all Plaintiff productions. The time zone used for a production shall be Eastern Standard Time.

2. All TIFF images shall display tracked changes, comments and other rich data as displayed in the document, regardless of the display setting for this information as last saved by the custodian, to the extent technically possible.

F. **IDENTIFICATION OF ESI IN PRIVILEGE LOGS**

1. Each member of a family of documents (i.e., each member of a set of documents in a parent-child relationship to each other) that is withheld or redacted shall be identified individually (e.g., e-mail attaching memorandum), but members of the same family (to the extent such members are also being withheld or redacted) may be logged together as a single entry on the Privilege Log.

2. Any e-mail chain (i.e., a series of e-mails linked together by e-mail responses and forwarding) that is withheld or redacted may be logged together as a single entry on the Privilege Log and may be identified by the topmost e-mail in the chain that is withheld or redacted.

3. Communications between a Party and its outside counsel who has been retained in this litigation dated on or after February 14, 2017 need not be included on any privilege log.

G.   **VALIDATION PROCEDURES**

1. The process for producing documents located through electronic searches should incorporate quality-control and quality assurance procedures to ensure a reasonable production consistent with Fed. R. Civ. P. 26(g). Once a producing Party that has employed electronic searches reasonably believes that it has produced or identified for production substantially all responsive documents, but in any event, before May 15, 2019, it shall validate the production as described below. These validation procedures shall apply regardless of whether technology-assisted review ("TAR") or exhaustive manual review ("manual review") was used by the producing Party to assist in identification of responsive documents.

2. The Document Collection ("Collection") is defined as including all documents identified for review for responsiveness and/or privilege following the application of keywords or other culling criteria.

3. The Collection shall be partitioned into the following three Subcollections, for manual review or for TAR processes, respectively:

    a.   Documents identified by the review as responsive to at least one Request for Production, including any privileged documents, but not including family members of responsive documents, unless those family members are deemed to be responsive in their own right ("Subcollection (1)");

    b.   Documents coded as non-responsive by a human reviewer, regardless of how the documents were selected for review (e.g., by TAR, manual review, or otherwise) ("Subcollection (2)");

    c.   Documents excluded from manual review as the result of a TAR process ("Subcollection (3)"). If the review process involved only manual review and no TAR, the Collection will not include Subcollection (3).

4. A sample shall be drawn consisting of the following:

    a.   250 documents selected at random from Subcollection (1) ("Subsample (1)");

    b.   250 documents selected at random from Subcollection (2) ("Subsample (2)");

    c.   250 documents selected at random from Subcollection (3) ("Subsample (3)").

**5.** The sample of 750 documents comprised of the documents from Subsamples 1, 2, and 3 shall be combined into a single Validation Sample, with no indication of the Subcollection from which the documents were derived or how they were previously coded. The Validation Sample shall be reviewed and coded by a subject matter expert ("SME") who is knowledgeable about the subject matter of the litigation. This should be an attorney who is familiar with the RFPs and the issues in the case. During the course of the review of the Validation Sample, the SME shall not be provided with any information concerning the Subcollection or Subsample from which any document was derived or the prior coding of any document. The intent of this requirement is to ensure that the review of the Validation Sample is blind; it does not preclude a Party from selecting as SMEs attorneys who may have had prior involvement in the original review process.

**6.** Once the coding has been completed, the producing Party shall prepare a table listing each of the 750 documents in the Validation Sample. For each document, the table shall include:

**a.** the Bates number of the document (for documents produced), or a control/identification number (for non-produced documents);

**b.** the Subsample from which the document came;

**c.** the SME's responsiveness coding for the document (i.e., responsive or non-responsive);

**d.** the SME's privilege coding for the document (i.e., privileged or not privileged). If the document is coded as non-responsive, a privilege determination need not be made. All documents in the Validation Sample coded as privileged shall be included on the producing Party's Privilege Log.

**e.** for putative class plaintiffs, the named class representative associated with the document.

**7.** The following items shall be provided to the requesting Party:

**a.** the table described above;

**b.** a copy of each responsive, non-privileged document in the Validation Sample that was not previously produced or identified for production to the requesting Party.

**8.** Once the requesting Party has had an opportunity to review the items described above, the Parties shall meet and confer to determine whether the quantity and nature of the responsive documents identified through the sampling process indicate that the review is substantially complete. If the samples indicate that any of the Subcollections (2) and/or (3) contain non-marginal, non-duplicative responsive documents as compared to Subcollection (1), the review and quality assurance process shall continue, and the validation process shall be repeated, as warranted.

**EXHIBIT A:  TECHNICAL REQUIREMENTS FOR DOCUMENTS PRODUCED (Paper or ESI)**

1. **PRODUCTION OF DOCUMENT IMAGES:**

   - Image Resolution of at least 300 DPI

   - Produce documents in Single Page Group IV TIFF black and white files unless (i) it is a database, spreadsheet, presentation, audio/video, PDF, or any other ESI that is not accurately represented in TIFF format — in which case it should be produced in Native Format; or (ii) the original document contains color text, markings, or graphics.  Any documents with color shall be produced in single-page JPEG format, provided it offers sufficient quality for review.  If either party deems the quality of the JPEG file insufficient, the document must be produced in TIFF or PDF format.

   - File Naming Convention: Match Bates Number of the page

   - Insert placeholder image for files produced in Native Format

   - Original document orientation shall be retained

2. **FULL TEXT EXTRACTION/OCR**

   - Produce full extracted text for all file types including text of embedded content

   - Produce OCR text for any paper document

   - Produce OCR text for any ESI where the source format was an image file (such as JPG, JPEG, GIF, BMP, PCX, PNG, TIF, TIFF etc.) and extracted text cannot be provided, using industry standard OCR technology

   - Production format: Single text file for each document, not one text file per page

   - File Naming Convention: Match Beg Bates Number

3. **PRODUCTION METADATA FIELDS:**

   - **BegBates**: Beginning Bates Number

   - **EndBates:** Ending Bates Number

   - **BegAttach**: Beginning Bates number of the first document in a document family range. Documents that are part of document families, i.e. containing parents or attachments should receive a value.

- **EndAttach:** Ending Bates number of the last document in attachment range a document family range. Documents that are part of document families, *i.e.* containing parents or attachments, should receive a value.

- **PgCount:** Page Count

- **Custodian:** Name of the Custodian of the Document Produced — Last Name, First Name format

- **CustodianAll:** Names of all Custodians, including any blind copy (BCC) recipients, of any documents that were not produced because they are MD5 or SHA-1 duplicates of the produced version of the given document

- **FileName:** Filename of the original source ESI as stored by the custodian

- **FilePath:** Full path of the original source ESI as stored by the custodian

- **NativeLink:** Path and filename to produced Native file.

- **NativeFile:** "Yes," for documents produced in native format; otherwise, blank

- **EmailSubject:** Subject line extracted from an email message

- **Title:** Title field extracted from the metadata of a non-email document

- **Author:** Author field extracted from the metadata of a non-email document

- **From:** From field extracted from an email message

- **To:** To or Recipient field extracted from an email message

- **Cc:** CC or Carbon Copy field extracted from an email message

- **BCC:** BCC or Blind Carbon Copy field extracted from an email message

- **DateRcvd:** Received date of an email message (mm/dd/yyyy format)

- **TimeRcvd:** Received time of an email message

- **DateSent:** Sent date of an email message (mm/dd/yyyy format)

- **TimeSent:** Sent time of an email message

- **DateCreated:** Date that a file was created (mm/dd/yyyy format)

- **DateLastModified:** Last modification date

- **TimeZone:** Time zone used for displaying dates and times on the associated TIFF image

- **Fingerprint:** MD5 or SHA-1 hash value of the file generated at the document family level

- **FileType:** File type description of the file (Excel, Word, PowerPoint, etc.)

- **Paper:** Designating that a document originated in paper form. "Yes" for documents originating in paper form, otherwise left blank

- **ProdVolume:** Identifies production media deliverable

- **ExtractedText:** File path to Extracted Text/OCR File

- **Redacted:** "Yes," for redacted documents; otherwise, blank

- **Confidentiality:** "Confidential" or "Highly Confidential," if a document has been so designated under the Protective Order; otherwise, blank

- **Attach Count:** Number of attached files

- **AttachName:** The file name(s) of the attached items delimited with a semicolon

- **Importance Ranking:** Level of importance/sensitivity of messages or calendar items

- **ParentBates:** First Bates number for the parent item of a family —**Will not be populated for items that are not part of a family. Should be populated in each record representing an attachment "child" item.

- **AttachBates:** First Bates number of each "child" attachment —**Can be more than one Bates number listed depending on the number of attachments. Should be populated in each record representing a "parent" document.

4.  DE-DUPLICATION

- De-duplication method: Parties must de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash value matching
- Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced

5.  IMAGE LOAD FILES

- The name of the image load file should mirror the name of the delivery volume, and should have an .OPT extension (*i.e.,* ABC001.0PT)

- The volume names should be consecutive (*i.e.*, ABC001, ABC002, et. seq.)

- There should be one row in the load file per TIFF image.

- Every image in the delivery volume should be contained in the image load file.

- The image key should be named the same as Bates number of the page.

- Load files should not span across media (e.g., CDs, DVDs, Hard Drives, etc.), i.e., a separate volume should be created for each piece of media delivered.

- The Opticon OPT image load file (.OPT) configuration shall be a page level comma-delimited file containing seven fields per line: PageiD, VolumeLabel, ImageFilePath, DocumentBreak, FolderBreak, BoxBreak, PageCount

    - **PageiD**: PageiD of the item being loaded. This field must be identical to the image name (less the file extension).

    - **VolumeLabel**: This field should match the Volume Name assigned in the corresponding metadata load file.

    - **ImageFilePath:** The path to the image from the root of the delivery media.

    - **DocumentBreak:** The letter "Y" denotes the first page of a document. If this field is blank, the page is not the first page of a document.

    - **FolderBreak:** Leave empty.

    - **BoxBreak:** Leave empty.

    - **PageCount:** Optional.

        - Example Opticon Delimited File:

MSC000001,MSC001,D:\IMAGES\001\MSC000001.TIF,Y,,3
MSC000002,MSCOO 1 ,D:\IMAGES\00 **1** \MSC000002. TIF, Y,,
MSC000003,MSCOO 1 ,D:\IMAGES\00 1 \MSC000003 .TIF, Y ,,
MSC000004,MSC001,D:\IMAGES\001\MSC000004.TIF,Y,,2
MSC000005,MSC001,D:\IMAGES\001\MSC000005.TIF,Y,,

        - Concordance Delimited Files:

þBegDocþþEndDocþþBegAttachþþEndAttachþþCustodianþ

        - The data load file should use standard Concordance delimiters:
            - Comma-- ¶ (ASCII 20)
            - Quote—þ (ASCII 254)
            - Newline—® (ASCII174)

    - The first record should contain the field names in the order of the data;
    - All date fields should be produced in mm/dd/yyyy format;
    - Use carriage-return line-feed to indicate the start of the next record;
    - Load files should not span across media (*e.g.*, CDs, DVDs, Hard Drives, Etc.); a separate volume should be created for each piece of media delivered;
    - The name of the data load file should mirror the name of the delivery volume, and should have a .DAT extension (*i.e.*, ABC00l.DAT);
    - The volume names should be consecutive (*i.e.*, ABC00l, ABC002, et. seq.)