**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DAVID G. FEINBERG, *et al.*,          *
and all others similarly situated,

     Plaintiffs                              *

     v.                                      *          CIVIL NO.  JKB-17-427

T. ROWE PRICE                          *
GROUP, INC., *et al.*,
                                *

     Defendants                              *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM</u>**[\*]

    This case involves a challenge to the administration of the T. Rowe Price U.S. Retirement Program (the "Plan"), brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  It is one of a slew of recent lawsuits challenging the common practice wherein financial services organizations' 401(k) plans offer the organizations' own proprietary investment vehicles.  *See, e.g.*, *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018); *Baird v. BlackRock Institutional Tr. Co., N.A.*, Civ. No. HSG-17-01892, 2021 WL 105619 (N.D. Cal. Jan. 12, 2021); *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189 (D. Mass. 2020); *Fuller v. SunTrust Banks, Inc.*, Civ. No. ODE-11-784, 2019 WL 5448206 (N.D. Ga. Oct. 3, 2019); *Moreno v. Deutsche Bank Americas Holding Corp.*, Civ. No. LGS-15-9936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, Civ. No. JLS-15-1614, 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016).  In this lawsuit, as in those listed above, Plaintiffs

---

[\*] This Opinion has been redacted to omit confidential information submitted in sealed filings.

argue that fiduciaries violated ERISA by favoring such proprietary funds over unaffiliated alternatives.

These proprietary fund cases implicate somewhat different concerns than more traditional ERISA challenges to, *e.g.*, defined benefit plan fiduciaries who take unwise gambles that cost beneficiaries their benefits, *see Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000), or 401(k) plan fiduciaries who offer company stock that they know will decline in value. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007) (challenging fiduciaries' failure to remove option of investing in U.S. Airways company stock after September 11, 2001). Proprietary fund cases can involve situations in which it is difficult to ascertain whether plan participants suffered a real financial harm, and in which the plaintiffs' criticisms often implicate the 401(k) industry as a whole, more than any individual fiduciary. The Court is generally skeptical of such litigation to the extent it seeks to cast the Court in the role of policymaker and have the Court declare strictly unlawful "normal business practice[s]" that do not harm plan participants and that Congress and the Department of Labor have declined to expressly prohibit. Participant Directed Individual Account Plans, 56 Fed. Reg. 10,724, 10,730 (proposed Mar. 13, 1991) (noting that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor").

Having reviewed the evidence in this case, the Court does not see the sort of egregious improprieties that would support the nine-figure damages award Plaintiffs seek. Though Defendants showed a preference for in-house funds, those funds have generally performed well, as attested by the fact that the Plan's assets have more than tripled in value in the relevant period. The record reflects that the fees Plaintiffs characterized as highly exceptional in their pleadings were mid-market for peer group investment vehicles. Many of the funds at issue were widely

utilized by independent investors, who evidently deem them desirable.  This evidence does not conform with Plaintiffs' allegations of shocking and pervasive mismanagement.

Nevertheless, the Court is mindful that on summary judgment, Plaintiffs need only produce evidence that, if accredited, would be sufficient for a fact-finder to surmise that Defendants took some unlawful actions and thereby caused Plaintiffs at least some harm.  While on the record before it this Court deems total victory improbable, and recovery on the scale suggested by Plaintiffs *highly* improbable, Plaintiffs have largely cleared the low bar that avoids summary judgment in favor of their opponent.  Accordingly, they are entitled to proceed to trial.

Now pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (ECF No. 142), Defendants' Cross-Motion for Summary Judgment (ECF No. 147), and Plaintiffs' two Motions to Strike (ECF Nos. 180, 190).  The motions are fully briefed and no hearing is required.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons set forth below, the Court will: (1) deny Plaintiffs' Motion for Partial Summary Judgment (ECF No. 142); (2) grant in part and deny in part Defendants' Cross-Motion (ECF No. 147), and (3) deny Plaintiffs' Motions to Strike (ECF Nos. 180, 190).

## I.    *Background*

Defendant T. Rowe Price Group, Inc. ("T. Rowe Price") is a large financial services organization with more than $1.2 trillion in assets under management.  (Def. Statement of Undisputed Material Fact ¶¶ 2–3, ECF No. 154 ["DSMF"].)[1]  T. Rowe Price is the sponsor of the Plan.  (*Id.* ¶ 10.)  Defendant T. Rowe Price Associates, Inc. ("T. Rowe Price Associates") is a wholly-owned subsidiary of T. Rowe Price that provides investment advisory services to T. Rowe Price's mutual funds.  (*Id.* ¶ 5.)  Defendant T. Rowe Price Trust Company ("T. Rowe Price Trust,"

---

[1] Citations to the parties' "statement of material fact" submissions incorporate the exhibits referenced therein.

and, collectively with T. Rowe Price Associates, the "T. Rowe Price Investment Affiliates") is a wholly-owned subsidiary that provides investment management services to T. Rowe Price's collective investment trusts ("CITs").[2]  (*Id.* ¶¶ 6–8.)  Defendants Preston Athey, Steven Banks, Celine Dufetel, Eric Gee, Michael McGonigle, Kenneth Moreland, Lawrence Puglia, and Meredith Stewart (collectively, the "Trustees") served as the trustees of the Plan during the "Class Period"— February 14, 2011 through the date of judgment.  (Pl. Statement of Material Fact ¶¶ 4–18, ECF No. 145-2 ["PSMF"].)  Each Trustee was a senior T. Rowe Price officer or employee at the time of his or her appointment, and two were the portfolio managers of funds offered by the Plan.  (*Id.*)  Defendants T. Rowe Price Group, Inc. Board of Directors ("Board of Directors"), T. Rowe Price Group, Inc. Management Committee ("Management Committee"), and T. Rowe Price Group, Inc. Management Compensation Committee ("Management Compensation Committee") collectively shared the authority to appoint and remove trustees.  (*Id.* ¶¶ 19–22.)  The Plaintiff Class includes, with limited exclusions, all Plan participants "who had a balance in their plan account at any time" during the Class Period.  (Class Cert. Order, ECF No. 83.)

The Plan is a defined contribution 401(k) "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), established for the purpose of providing retirement income to T. Rowe Price employees.  (PSMF ¶¶ 1–2.)  Employees have the option of contributing a percentage of their compensation to their Plan accounts, and T. Rowe Price makes matching, fixed, and discretionary contributions.  (DSMF ¶¶ 10–23.)  T. Rowe Price also "provides recordkeeping services to the Plan" free of charge, "meaning that it keeps track of information such as participant balances and elections, and provides administrative and other services."  (*Id.* ¶¶ 307–08.)  From

---

[2] "A 'Collective Investment Trust' refers to an investment vehicle, other than a mutual fund governed by the Investment Company Act of 1940, that is offered for investment to more than one investor."  (Second Am. Compl. ¶ 10 n.3, ECF No. 84.)

January 31, 2011 to January 31, 2020, the Plan's total assets under management increased from approximately $980 million to $3.12 billion.  (*Id.* ¶¶ 10–23.)

The Trustees oversee the Plan and determine what investment options it offers to participants, who then have the discretion to decide in which offerings to invest.  (*Id.* ¶ 24.)  The Trustees are guided by the Plan's governing documents, and they receive support and advice from T. Rowe Price staff and the Plan's ERISA counsel.  (*Id.* ¶¶ 41–42.)  They have never engaged the services of a third-party consultant to advise regarding the Plan.  (PSMF ¶ 70.)

Since the Plan's inception in 2001, the Trustees have followed a practice of exclusively offering proprietary T. Rowe Price investment vehicles.  (PSMF ¶ 33.)  In 2010, T. Rowe Price amended the Plan document to formalize this practice by dictating that the Trustees would select the Plan's offerings from among funds offered by T. Rowe Price, "except where such funds d[id] not meet the needs of Plan participants."  (DSMF ¶ 46.)  In 2014, T. Rowe Price further amended the Plan document to specifically mandate that the Plan would offer a wide range of T. Rowe Price investment options, and only those investment options.  (*Id.* ¶ 56.)  In accordance with this instruction, during the Class Period, the Trustees only offered funds that were created and managed by Defendants.  (PSMF ¶¶ 4–5.)  The Plan consistently offered more than 70 options, including dozens of actively managed funds covering varied strategies, a handful of passively managed index funds, and target-date funds.  (DSMF ¶¶ 43–45.)  The T. Rowe Price Investment Affiliates charged all investors in these funds (including Plan participants) regular management fees.  (PSMF ¶ 29.)

Throughout the Class Period, the Trustees have met at least twice annually to review and discuss the Plan's performance.  (DSMF ¶¶ 82–83.)  Pursuant to an Investment Policy Statement and Investment Option Review Checklist, the Trustees have reviewed qualitative and quantitative factors for each Plan offering at these meetings.  (*Id.* ¶¶ 89–110.)  The quantitative assessment has

included a review of Lipper and (starting in 2016) Morningstar "Report Cards," which compare T. Rowe Price funds to peer group funds across a variety of metrics. (*Id.* ¶¶ 144–54.) The Trustees have not compared the T. Rowe Price funds to specific alternative funds, or seriously contemplated the merits of replacing any T. Rowe Price fund with an alternative. (*Id.* ¶ 208.)

The majority of the funds offered by the Plan have consistently been in the top half of their peer groups in terms of both performance and expenses. (*Id.* ¶¶ 182–99.) Those funds that are not in the top half of their peer group in one of those metrics for a certain period are identified as "exception" strategies and flagged for review. (*Id.* ¶ 200; PSMF ¶¶ 45–46.) The Trustees have appointed two Trustees to investigate the exceptions funds by conducting research and engaging in discussions with T. Rowe Price management. (DSMF ¶¶ 158–78; PSMF ¶¶ 48–51.) Following these investigations, the Trustees have always determined that the exception funds should be retained as Plan options. (DSMF ¶¶ 178, 207–08.)

In addition to reviewing the Plan's offerings, the Trustees have also regularly added new proprietary funds offering novel strategies and replaced existing funds with funds offering the same strategies at lower cost. (PSMF ¶¶ 38–40; DSMF ¶¶ 217–40.) Generally, the Trustees have followed a practice of adding novel investment vehicles to the Plan shortly after inception. (PSMF ¶¶ 38–40.) The 2014 amendment to the Plan document formalized this practice by directing that novel funds would be added "as soon as practicable after the first Trustees' meeting occurring on or after a date that is six months after" the fund became available. (DSMF ¶ 58.) Additionally, as changes in the Plan's assets or the directions in the Plan document have made lower-fee options available, the Trustees have replaced higher-fee investment vehicles (often mutual funds) with lower-fee investment vehicles (often CITs) that pursue the same strategies. (*Id.* ¶¶ 217–40.)

On February 14, 2017, Plaintiffs brought this lawsuit, claiming that Defendants' conduct as Plan fiduciaries violated ERISA.  (Compl., ECF No. 1.)  Plaintiffs allege seven Counts:

- Count I - Breach of Duties of Loyalty and Prudence for Imprudent and Disloyal Monitoring and Selection of 401(k) Plan Investments during the Class Period, which Caused Losses to the 401(k) Plan (Violation of ERISA, 29 U.S.C. § 1104);

- Count II - Breach of ERISA Fiduciary Duties by Failing to Remove and Prudently Monitor the 401(k) Plan Trustees;

- Count III - Breach of Duties of Loyalty and Prudence by Providing Imprudent and Self-Interested Investment Advice to [Plan Trustees] (Violation of ERISA, 29 U.S.C. § 1104);

- Count IV - Liability for Breach of Co-Fiduciary (Pursuant to ERISA, 29 U.S.C. § 1105);

- Count V - Liability for Failing to Remedy Breach of Predecessor Fiduciaries;

- Count VI - Liability for Committing Prohibited Transactions (Violation of ERISA, 29 U.S.C. § 1106);

- Count VII - Other Equitable Relief Based on Ill-Gotten Proceeds (Violation of ERISA, 29 U.S.C. § 1132(a)(3)).

(*See* Second Am. Compl., ECF No. 84.)  Defendants moved to dismiss, and the motion was denied.  (Mot. Dismiss Mem. Op., ECF No. 58.)  The Court then granted class certification.  (*See* Class Cert. Order, ECF No. 83.)

Following discovery, Plaintiffs moved for summary judgment on Counts I, III, and VI (s*ee* Pl. Mot. Summ. J. Mem. Supp., ECF No. 145-1), and Defendants cross-moved for summary judgment on all claims (*see* Def. Mot. Summ. J. Mem. Supp., ECF No. 147-1).  Each side supported its briefing with voluminous exhibits, expert reports, and "statement of material fact" filings summarizing the evidence.  The parties also filed response and reply briefs, along with which they included further "statement of material fact" filings contesting the other parties' asserted facts.  (*See* DSMF; Pl. Response to DSMF, ECF No. 177-3; Def. Reply to Pl. Response to DSMF, ECF No 186-1.)  Plaintiffs also filed two motions to strike, seeking to strike two

declarations (*see* First Mot. Strike Mem. Supp., ECF No. 183-1), and Defendants' final "statement of material fact" filing (*see* Second Mot. Strike Mem. Supp., ECF No. 190-1).

## II.      Motions to Strike

Preliminarily, the Court will deny Plaintiffs' motions to strike.  In their first motion, Plaintiffs seek to strike the entirety of the Declaration of Lawrence Puglia and paragraph 13 of the Declaration of Clay Bowers under the "sham affidavit" doctrine.  (*See* First Mot. Strike Mem. Supp.)  Alternatively, Plaintiffs argue that Mr. Puglia's declaration is insufficient to establish many of the facts asserted therein, on the grounds that some of his assertions are hearsay or are insufficiently supported.  (*Id.*)

The sham affidavit doctrine prevents a party from recanting deposition testimony with a directly contradictory declaration in order to manufacture the false appearance of a factual dispute. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).  It is a doctrine reserved for unusual cases, and its application is "carefully limited to situations involving flat contradictions of material fact."  *Mandengue v. ADT Sec. Sys., Inc.*, Civ. No. ELH-09-3103, 2012 WL 892621, at \*18 (D. Md. Mar. 14, 2012).

The doctrine is inapplicable here.  While Plaintiffs are correct that some of the statements in Mr. Puglia's declaration are more detailed than his deposition testimony or somewhat at odds with certain explanations provided therein, the statements identified by Plaintiffs are not so directly contrary to deposition testimony that the entire declaration could be considered a dishonest sham. Likewise with the portion of Mr. Bowers' declaration to which Plaintiffs object; Mr. Bowers' admission of uncertainty regarding whether certain investors received special treatment is not so contrary to his assertion that the Plan utilized the same schedules as applicable to other retirement plans as to render the latter a sham.  Further, unlike in *Genesis Off. Sys., Inc. v. PNC Bank, N.A.*,

639 F. App'x 939 (4th Cir. 2016), on which Plaintiffs rely, the testimony Plaintiffs identify relates to minor factual details. As is made clear below, it is far from the only evidence standing between Plaintiffs and summary judgment.

As such, rather than striking the declarations, the Court will simply take note of the discrepancies identified by Plaintiffs and credit deposition testimony where it conflicts with declaration testimony. Likewise, though the Court notes Plaintiffs' objection that Mr. Puglia's declaration includes hearsay and uncorroborated assertions, striking the declaration is not the appropriate remedy. Instead, the Court will apply the Federal Rules of Evidence in evaluating the sufficiency of the testimony to establish each of the facts asserted by Defendants.

In their second motion to strike, Plaintiffs seek to strike Defendants' Reply to Plaintiffs' Response to DSMF (ECF No. 186-1), on the grounds that this submission reaches beyond the traditional limits of a statement of fact filing into the realm of legal argument, and therefore represents briefing in excess of the permitted page limit. (*See* Second Mot. Strike.) Defendants rejoin that both parties' "statement of fact" submissions are without explicit sanction from the Local Rules or the Court, and that Plaintiffs engaged in legal argumentation in their own "statement of fact" filings. (*See* Opp'n Mot. Strike at 14–16, ECF No. 193.)

It is clear that in their efforts to fully present numerous sophisticated arguments regarding a multi-faceted dispute, both sides have used their responses to statements of material fact to raise legal arguments not addressed in their briefing. As such, rather than striking a single submission in its entirety, the Court will simply limit its review of the "statement of fact" submissions to the asserted facts and exclude improper legal argumentation from its analysis.

### III.     Summary Judgment Legal Standard

Turning to the cross-motions for summary judgment, a party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If a party carries this burden, then the Court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e).  If sufficient evidence exists for a reasonable fact-finder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  *Id.* at 252.  When both parties file motions for summary judgment, the Court evaluates "each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 729 (D. Md. 1996) (citations omitted).

### IV.     Summary Judgment Analysis

Factual disputes preclude summary judgment for either Plaintiffs or Defendants on almost all claims.  Though the Court is skeptical of certain of Plaintiffs' arguments regarding alleged breaches of fiduciary duties, Plaintiffs have largely identified sufficient evidence to allow their claims to proceed to trial.  As for the prohibited transaction claims, while the Court can resolve the legal questions presented by the parties, factual complexities preclude a global ruling in either side's favor at the summary judgment stage.

### A.  Count I: Breach of Fiduciary Duties

In Count I, Plaintiffs claim that the Trustees breached their fiduciary duties of loyalty and prudence.  Title 29 U.S.C. § 1104(a) establishes these twin fiduciary duties by requiring that fiduciaries act "solely in the interest of the participants and beneficiaries," and do so "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use[.]"  To satisfy ERISA's duty of loyalty, fiduciaries must show "complete loyalty" to plan participants and beneficiaries.  *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation omitted).  Though "it is not fatal that a fiduciary has 'financial interests adverse to beneficiaries,'" a fiduciary cannot let such interests affect his or her judgment.  *DiFelice*, 497 F.3d at 421 (quoting *Pegram,* 530 U.S. at 225).

To satisfy ERISA's duty of prudence, a trustee "of a defined contribution, participant-driven, 401(k) plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants—must exercise prudence in selecting and retaining available investment options."  *DiFelice*, 497 F.3d at 418.  A court faced with a duty of prudence challenge "must ask whether the fiduciary engaged in a reasoned decisionmaking process, consistent with that of a 'prudent man acting in like capacity.'"  *Id.* at 420 (quoting 29 U.S.C. § 1104(a)(1)(B)).  The prudence analysis is informed by a fiduciary's duty to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1)(D).  However, plan terms cannot "trump the duty of prudence," and a fiduciary has an obligation to diverge from plan document instructions where necessary to protect the interests of plan participants.  *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 367 n.16 (4th Cir. 2014).

11

Plaintiffs raise three specific criticisms of the Trustees' conduct that Plaintiffs argue support a summary judgment holding that the Trustees were disloyal and imprudent as a matter of law. First, Plaintiffs argue that the Trustees breached their fiduciary duties by failing to secure independent advice or otherwise mitigate their conflicts of interest. (*See* Pl. Mot. Summ. J. Mem. Supp. at 11–18.) Second, Plaintiffs challenge the Trustees' practice of exclusively offering proprietary T. Rowe Price investment vehicles without seriously considering specific alternatives. (*See id.* at 18–22.) Plaintiffs argue that through this practice, the Trustees improperly denied Plan participants access to lower-fee and higher-performing options offered by competitors, in order to secure fees for Defendants. (*See id.*) Third, Plaintiffs take issue with what they characterize as the Trustees' haste in adding new T. Rowe Price funds as Plan options before such funds could accrue reliable track records. (*Id.* at 22.)

Defendants respond to Plaintiffs' first argument by noting that ERISA does not impose any independent duty to avoid conflicts of interest and by arguing that, in light of the Trustees' oversight process and the Plan's successful record, the Trustees had no need to seek independent advice. (*See* Def. Mot. Summ. J. Mem. Supp. at 15–17.) Defendants respond to the second argument by noting the Plan's instructions and pointing to evidence that the Trustees deployed a thorough monitoring process. (*Id.* at 17–20.) Defendants also note that other courts have found that "[a] fiduciary of a plan sponsored by an asset manager is not required to consider competitors' funds if the proprietary funds chosen in the Plan are prudent options" and that "it is not disloyal as a matter of law to offer only proprietary funds." *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 701–03 (W.D. Mo. 2019) (compiling cases). In response to Plaintiffs' criticism that the Trustees offered new funds too quickly, Defendants rejoin that the Plan directed the Trustees

to do so and that T. Rowe Price's track record justified providing participants the option to invest in new funds.  (*See* Def. Mot. Summ. J. Mem. Supp. at 20–21.)

In support of their own motion for summary judgment, Defendants further argue that, given the Plan document's clear instructions to only offer T. Rowe Price funds, the Trustees' oversight process and the Plan's overall success collectively establish that Defendants acted with prudence and loyalty.  Defendants critique the analysis of Plaintiffs' expert Dr. Halpern, which fails to account for the Plan document's instructions.  (*Id.* at 10–15.)  Defendants argue that in light of this deficiency, Plaintiffs have failed to provide evidence based on which a fact-finder could find fiduciary violations.  (*Id.*)  Additionally, Defendants contend that Plaintiffs have not provided evidence of loss to the Plan.  (*Id*. at 27–30.)

Neither side is entitled to summary judgment on Count I.  Disputed issues of fact preclude a decision at this stage.

Starting with Plaintiffs' motion and beginning with their first argument, though Plaintiffs have cited solid authority for the proposition that it may be a best practice for conflicted trustees to obtain independent advice in fraught situations, none of the authorities Plaintiffs cite stand for the proposition that ERISA demands this measure in all cases.  Indeed, ERISA explicitly permits corporate officers and employees to serve as fiduciaries, *see* 29 U.S.C. § 1108(c)(3), and numerous courts have rejected the argument that ERISA imposes liability merely for failing to avoid conflicts.  *See, e.g., In re Constellation Energy Grp., Inc. ERISA Litig.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010); *Wildman*, 362 F. Supp. 3d at 701.  Likewise, there is no rule that conflicted fiduciaries must seek independent advice.  *See Dormani v. Target Corp.*, 970 F.3d 910, 916–17 (8th Cir. 2020).  Plaintiffs' attempt to rely on *dicta* from *DiFelice* to establish such a duty is unpersuasive.  497 F.3d at 418.  The predicament facing the fiduciaries in *DiFelice* as they needed

13

to decide what to do about the U.S. Airways 401(k) plan's offering of cratering company stock in the aftermath of the September 11 attacks bears no resemblance to the situation facing the Trustees as the Plan's diversified assets climbed from $980 million to $3.12 billion.   And Plaintiffs' citations to cases involving pension fund fiduciaries' misuse of assets in battles over corporate control are even less relevant.   (*See* Pl. Mot. Summ. J. Mem. Supp. at 12–14 (citing *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984)); *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982).)  In short, while the evidence that the Trustees did not seek independent counsel or adopt the other conflict mitigation strategies advocated by Plaintiffs is notable, it is not grounds for summary judgment.

Likewise with the Trustees' practice of following the Plan document's directives by offering only T. Rowe Price funds without considering specific alternatives.  While Plaintiffs are correct that whether a trustee considered specific alternative investments is a factor in the fiduciary duty analysis, the authority Plaintiffs cite does not support the proposition that a trustee's failure to do so renders his process imprudent as a matter of law.  To the contrary, the Fourth Circuit decisions cited by Plaintiffs explicitly acknowledge that there is no "uniform checklist" for determining prudence.  *Tatum*, 761 F.3d at 358 ("[A]lthough the duty of procedural prudence requires more than a pure heart and an empty head, courts have readily determined that fiduciaries who act reasonably—i.e., who appropriately investigate the merits of an investment decision prior to acting—easily clear this bar.") (internal quotation marks and citation omitted).  Further, as noted, Defendants cite cases holding that fiduciaries who failed to consider specific alternatives to proprietary offerings acted prudently and loyally—even absent plan document provisions analogous to those at issue here.  *See, e.g.*, *Wildman*, 362 F. Supp. 3d at 701–06.  While the Court acknowledges Plaintiffs' nuanced criticism of the *Wildman* decision, Plaintiffs present no contrary authority indicating that the issue could be so clear-cut as to entitle them to summary judgment.

Turning to Plaintiffs' criticism of Defendants' haste in offering novel funds, aside from identifying a June 2011 email in which a Trustee expressed concern that, in the past, new funds had been added too quickly, Plaintiffs cite neither facts nor legal authority supporting summary judgment.  (*See* Pl. Mot. Summ. J. Mem. Supp. at 7, 22.)  Defendants' countervailing evidence is more than sufficient to prevent summary judgment in the face of such a paltry showing.

Defendants' own arguments also fail to establish their entitlement to summary judgment. Starting with Defendants' liability arguments, though the evidence shows the Trustees engaged in a legitimate oversight process and that the Plan's assets tripled under their stewardship, it would be premature to find that their conduct was loyal and prudent in all instances as a matter of law. In particular, the evidence that the Trustees never removed or replaced an "exception" fund casts some doubt on their prudence and loyalty in certain cases.  *See Fuller*, 2019 WL 5448206, at *24 (finding evidence that conflicted fiduciaries retained "proprietary funds [that] underperform[ed] for extended periods" precluded summary judgment).  Additionally, though Defendants are correct that Dr. Halpern's failure to account for the Plan document's directions undermines his analysis, even without Dr. Halpern's ultimate conclusion that the Trustees' process was "unreasonable," there remains sufficient evidence, taken in the light most favorable to Plaintiffs, for a fact finder to assign imprudence.

Likewise, though Defendants raise legitimate criticisms of Plaintiffs' damages arguments, Plaintiffs have provided sufficient evidence to survive summary judgment.  Defendants challenge both the methodologies offered by Plaintiffs' expert Dr. Pomerantz for evaluating the loss associated with individual funds and Plaintiffs' decision to select a seemingly arbitrary subgroup of 39 funds for their loss calculation.  (Def. Mot. Summ. J. Mem. Supp. at 27–30.)  Under ERISA, a plaintiff is required to make a *prima facie* showing that alleged fiduciary breaches caused losses

15

to plan participants.  However, the Fourth Circuit has established that this is a low bar on summary judgment, requiring only "that the plaintiff show 'that there was some sort of loss to the Plan.'" *Sims v. BB&T Corp.*, Civ. No. 15-732, 2018 WL 3128996, at *8 (M.D.N.C. June 26, 2018) (quoting *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 220 (4th Cir. 2011)).  Further, because "the prudence of investments or classes of investments offered by a plan must be judged individually," this *prima facie* showing may focus on an allegedly imprudent subgroup of generally prudent offerings.  *DiFelice*, 497 F.3d at 423 (quoting *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 309 n.18 (5th Cir. 2007)).

Plaintiffs have identified a group of 39 imprudent investment offerings that they claim resulted in loss, and their expert Dr. Pomerantz has offered three methodologies for calculating the losses associated with those particular funds: (1) comparison to the best performing alternative; (2) comparison to comparable funds offered by Vanguard and Fidelity; and (3) comparison to market returns via index funds.  (*See* Pomerantz Report, ECF No. 144-11.)  Numerous courts have accepted Dr. Pomerantz's damages calculation methodologies as sufficient to establish loss on summary judgment and have rejected Defendants' arguments that failure to specifically opine on the prudence of particular comparator funds is fatal at this stage.  *See, e.g.*, *Fuller*, 2019 WL 5448206, at *28 (compiling cases).  Further, even the *Wildman* court, which Defendants cite as rejecting Dr. Pomerantz's analysis following trial, denied a challenge to his methodology under the summary judgment standard.  *See Wildman v. Am. Century Servs., LLC*, Civ. No. DGK-16-737, 2018 WL 2326627, at *5–6 (W.D. Mo. May 22, 2018).  As such, the Court finds that for summary judgment purposes, Dr. Pomerantz's methodology is sufficient to establish *prima facie* losses associated with the funds identified by Plaintiffs.

More compelling than Defendants' critique of Dr. Pomerantz's methodology is Defendants' criticism of Plaintiffs' unexplained selection of 39 funds for analysis. As Defendants point out, Plaintiffs provide no coherent justification for their focus on these particular funds. If, as Defendants suggest, Plaintiffs are using the benefit of hindsight to cherry-pick the worst performers out of a group that the Trustees selected utilizing a uniform process, Defendants may well be able to establish the invalidity of any resultant damages calculations. *See Wildman*, 362 F. Supp. 3d at 711 (rejecting Dr. Pomerantz's methodology in part because he "failed to isolate the effect of the alleged breach").

Nevertheless, even rejecting this purportedly arbitrary grouping, Plaintiffs have still provided sufficient evidence to make out a *prima facie* case of loss on summary judgment because the evidence submitted remains sufficient to assign losses to decisions for which there is specific evidence of imprudence or disloyalty. For example, Dr. Pomerantz provides loss calculations related to ███████████████████████████, which the Trustees consistently identified as an exception fund. (████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████) Thus, Plaintiffs have provided enough evidence to show "there was some sort of loss to the Plan," *Plasterers' Local*, 663 F.3d at 220, and the Court finds that evidence sufficient to generate a genuine issue of material fact.

In sum, summary judgment will be denied as to Count I because the facts presented are subject to multiple interpretations. At trial, a fact-finder could very well determine that the Trustees prudently followed the Plan's instructions and showed a reasonable preference for the high-performing investment vehicles that the Trustees and Plan participants knew best—to the benefit of the participants. Indeed, the Court finds that likely on the record before it. But, such a

finding is not *certain*. On this record, a reasonable fact-finder *could reject* the Trustees' justifications for at least some of their decisions and, for example, surmise that the Trustees imprudently offered certain underperforming T. Rowe Price funds for improper reasons.

### B.   Counts II, III, IV, V, and VII

In Counts II, IV, and V, Plaintiffs allege claims against various fiduciaries related to their roles in enabling or failing to remedy the Trustees' alleged breaches.   Defendants move for summary judgment on each of these derivative claims, on the grounds that they all "fail without an underlying breach."  (Def. Mot. Summ. J. Mem. Supp at 30–31.)  Since the Court is not ruling on the alleged underlying breach, summary judgment will be denied as to these Counts.

In Count VII, Plaintiffs seek equitable disgorgement of profits received by Defendants from the Plan's investments pursuant to 29 U.S.C. § 1132(a)(3).  As with Counts II, IV, and V, Defendants move for summary judgment based on Plaintiffs' alleged inability to establish an underlying breach.  (Def. Mot. Summ. J. Mem. Supp at 30.)  Defendants also summarily argue in a footnote that summary judgment should be granted as to Count VII because "Plaintiffs cannot point to an identifiable *res* to be disgorged."   (*Id.*)  However, in providing evidence regarding profits Defendants obtained from fees paid by Plan participants, Plaintiffs have made the necessary showing for purposes of summary judgment. *See Wildman*, 2018 WL 2326627, at \*9 (denying summary judgment on disgorgement claim).  As such, Count VII will proceed as well.

However, Defendants are entitled to summary judgment on Count III—Plaintiffs' claim that the T. Rowe Price Investment Affiliates breached their fiduciary duties by providing "self-interested and imprudent investment advice" to the Trustees.  (Second Am. Compl. ¶¶ 44, 105–07, 131–36.)  Defendants assert that there is "no evidence that T. Rowe Price's subsidiaries provided any 'investment advice' at all to the Trustees," noting that employees of the T. Rowe

Price Affiliates merely "supplied the Trustees with objective information (including Morningstar and Lipper peer rankings) about T. Rowe Price funds," which does not qualify as providing "investment advice" under ERISA.  (Def. Mot. Summ. J. Mem. Supp at 26.)  *See Leimkuehler v. Am. United Life Ins. Co.*, Civ. No. JMS-10-0333, 2012 WL 28608, at *12 (S.D. Ind. Jan. 5, 2012) ("presenting only information like expenses and historical return information," without "evaluative commentary," is not providing "investment advice"), *aff'd*, 713 F.3d 905 (7th Cir. 2013).  Plaintiffs fail to contest or otherwise address this argument.  They also fail to provide any evidence supporting their allegations that the T. Rowe Price Investment Affiliates provided true "investment advice."  As such, summary judgment will be granted to Defendants on Count III.

### C.  Count VI: Prohibited Transactions

In Count VI, Plaintiffs allege that in addition to being liable for breaching the duties of prudence and loyalty, Defendants are also liable for causing transactions that are prohibited by 29 U.S.C. § 1106.  Specifically, the Second Amended Complaint alleges that "in causing the 401(k) Plan to be invested in the in-house funds, and in causing the 401(k) Plan to pay, directly or indirectly, on a monthly basis, investment management and other fees to the T. Rowe Price Investment Affiliates," Defendants violated § 1106(a)(1)(A), (C), (D), and § 1106(b).  (Second Am. Compl. ¶ 153.)  Plaintiffs have moved for summary judgment that Defendants engaged in transactions prohibited by § 1106(b), and Defendants have cross-moved for summary judgment as to all the alleged § 1106 violations, though their briefing focuses almost exclusively on § 1106(b).

Section 1106(b) provides that a plan fiduciary may not:

(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).  Plaintiffs contend that Defendants violated § 1106(b)(1) and § 1106(b)(3) "by directing the investment of Plan assets into [T. Rowe Price Investment Affiliate] managed mutual funds and trusts in which they have a financial interest."  (Pl. Mot. Summ. J. Mem. Supp. at 26.)  Defendants do not contest that certain of the challenged transactions may have violated the terms of § 1106(b), but they argue that all the transactions at issue are subject to statutory exemptions to the § 1106(b) prohibitions.  Specifically, they argue that the "Plan's investments in T. Rowe Price collective trusts are exempted under [29 U.S.C. § 1108(b)(8)], and the Plan's investments in affiliated mutual funds are exempted under the regulatory class exemption in PTE 77-3[.]"  (Def. Mot. Summ. J. Mem. Supp. at 32.)  Additionally, they assert that the prohibited transaction claims are "largely time-barred by ERISA's statute of repose[.]"  (*Id.* at 35.)  The Court will address each argument in turn, starting with the asserted exemption for mutual fund transactions.

### 1.  *Application of PTE 77-3 to Mutual Fund Transactions*

Title 29 U.S.C. § 1108(a) authorizes the Secretary of Labor to "grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 1106 and 1107(a)[.]"  Undisputedly, this provision authorizes the creation of exceptions to the § 1106(b) prohibitions.  Shortly after ERISA was enacted, the Secretary of Labor exercised this authority by promulgating Prohibited Transaction Exemption 77-3 ("PTE 77-3"), 42 Fed. Reg. 18,734, 18,735 (Apr. 8, 1977), which makes the § 1106 prohibitions "inapplicable to employee benefits plans investing in in-house mutual funds," as long as four conditions are met.  *Moitoso*, 451 F. Supp. 3d at 205.  Plaintiffs do not contest that the first three conditions are met, or identify facts drawing into question Defendants' testimonial evidence that they are.  (*See* Pl. Response to DSMF ¶¶ 234–36.)  The

parties' briefing therefore focuses on the fourth condition—the requirement that all "dealings between the plan and the investment company . . . are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company."  PTE 77-3(d).

It is largely undisputed that throughout the Class Period, the Plan has been invested in the least-expensive available share class of each relevant mutual fund.[3]  (*See* Def. Reply Mem. at 23, ECF No. 184.)  However, Plaintiffs argue that Defendants still treated the Plan less favorably than other mutual fund investors because Defendants "offered revenue sharing rebates to other plans (and the recordkeepers of other plans) in connection with shares of [T. Rowe Price] mutual funds that were not made available to the Plan," with the result that the Plan participants effectively bore higher costs than other investors.  (Pl. Reply and Opp'n Mem. at 22–23, ECF No. 177-1.)[4]  Defendants acknowledge that "other retirement plans that are recordkept by T. Rowe Price receive recordkeeping service credits or 'rebates' on their investments in T. Rowe Price retail mutual funds that can be used to offset the costs of T. Rowe Price recordkeeping services and defray third-party administrative expenses."  (DSMF ¶ 309.)  But they contest whether other investors' receipt of these recordkeeping credits is relevant to the PTE 77-3 analysis, arguing that "all that matters under PTE 77-3" is whether the Plan "was invested in the lowest-cost share class" for the relevant mutual funds.  (Def. Reply Mem. at 23.)  Defendants further argue that even if the recordkeeping credits are relevant, the Plan's treatment has still been "no less favorable" than any other investor's, because: (1) "[s]ince 2014, the Plan Document has required T. Rowe Price to make 'administrative

---

[3] Though Plaintiffs identify instances in which other investors received access to CITs and institutional funds with lower expenses than comparable mutual funds, these instances are not directly relevant to the PTE 77-3 analysis, since PTE 77-3 "requires at least equally favorable terms only with other shareholders in [a] mutual fund, but not investors in similar but distinct investments."  *Moreno*, 2018 WL 2727880, at *6.

[4] The quoted sentence is redacted in the publicly filed version of Plaintiffs' memorandum (ECF No. 171).  However, the information was sealed to the benefit of Defendants, and Defendants revealed it in the publicly filed version of their DSMF (ECF No. 148).

budget contributions,'" equivalent to the recordkeeping credits received by other plans; and (2) "[b]efore 2014, T. Rowe Price directly paid the Plan's recordkeeping fees and administrative expenses," and following the initiation of this litigation, T. Rowe Price "made a voluntary payment that (in relevant part) retroactively extended the administrative budget contribution benefit to the 2011–2013 Plan years." (Def. Mot. Summ. J. Mem. Supp. at 33–34.)

Unresolved factual disputes prevent a global ruling as to PTE 77-3's application to all relevant mutual fund transactions. Nevertheless, the Court can resolve the legal issues raised by the parties. Preliminarily, the Court rejects Defendants' argument that "all that matters under PTE 77-3" is whether the Plan "was invested in the lowest-cost share class." (Def. Reply Mem. at 23.) As the First Circuit explained in *Brotherston*, recordkeeping credits can be a relevant aspect of the "dealings" addressed by PTE 77-3, to the extent that they provide a real financial "benefit" to other investors not enjoyed by the Plan. 907 F.3d at 28–30. Further, regarding the pre-2014 transactions, the Court rejects Defendants' assertion that a discretionary 2019 payment made in response to the initiation of litigation could be relevant to the PTE 77-3 determination, which focuses on the Defendants' contemporaneous dealings as fiduciaries. *C.f. id.* (finding discretionary employer contributions irrelevant to PTE 77-3 analysis).

However, regarding the post-2014 transactions, the Court agrees with Defendants that the administrative budget contributions are relevant to determining whether Defendants' dealings with the Plan were actually "less favorable" than their dealings with other investors. Plaintiffs argue that the administrative budget contributions are effectively equivalent to discretionary employer contributions and therefore irrelevant to the PTE 77-3 analysis. (Pl. Reply and Opp'n Mem. at 22–23.) The Court disagrees and finds persuasive the analysis in *Moitoso*, 451 F. Supp. 3d at 220–21. In that case, as here, the employer, acting in its capacity as sponsor, amended the plan

document to require that certain recordkeeping cost-related payments be made to the plan in order to ensure the plan was on equal footing with other investors.  *See id.*  The *Moitoso* court found that, because the amendment to the plan document rendered these payments mandatory and fiduciary in nature, they should factor into the PTE 77-3 analysis.  *See id.*  The Court agrees with this reasoning; by amending the Plan document to require the administrative budget contributions, T. Rowe Price imposed upon itself a duty to provide these contributions, clearly distinguishing them from a discretionary payment made in response to litigation.  To the extent that these contemporaneous and mandatory payments left the Plan just as well off as mutual fund investors who received a comparable benefit in the form of recordkeeping credits, they are relevant to the PTE 77-3 analysis.[5]

Having resolved these legal issues, the Court defers final decision regarding the application of PTE 77-3 to specific allegedly prohibited transactions.  Neither side has provided the level of detail regarding the transactions at issue or the terms on which Defendants dealt with other mutual fund investors necessary for the Court to rule on every allegedly prohibited transaction.  As such, final adjudication, within the parameters described above, shall await trial.  *C.f. Baird*, 2021 WL 105619, at *3–4 (finding global summary judgment inappropriate in similar circumstances).

### 2.  *Application of 29 U.S.C. § 1108(b)(8) to CIT Transactions*

Turning to the CIT transactions, Defendants argue that they are exempted by § 1108(b)(8), which provides:

> The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:
> . . .

---

[5] Plaintiffs' arguments regarding the calculation of the administrative budget contributions (*see* Pl. Reply and Opp'n Mem. at 24–25 (███████████████████████████) go to the issue of whether the administrative budget contributions placed the Plan on equal footing with other investors, but do not draw into doubt that the mandatory administrative budget contributions factor into the PTE 77-3 analysis.

> (8) Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if—
>> (A) the transaction is a sale or purchase of an interest in the fund,
>> (B) the bank, trust company, or insurance company receives not more than reasonable compensation, and
>> (C) such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan.

29 U.S.C. § 1108(b)(8).  Plaintiffs argue that this exemption does not protect Defendants from liability for alleged § 1106(b) violations because: (1) the § 1108(b)(8) exemption only applies to the § 1106(a) prohibitions, not § 1106(b) prohibitions; (2) even if § 1108(b)(8) does create exemptions to § 1106(b), it does not apply to the sort of fee payment transactions Plaintiffs challenge; and (3) even if § 1108(b)(8) does apply to these sorts of transactions, Defendants fail the "reasonable compensation" requirement.  (*See* Pl. Reply and Opp'n Mem. at 20–22, 26–29.)

Thus, the first issue facing the Court is the legal question of whether the § 1108(b)(8) exemption can ever apply to the § 1106(b) prohibitions.  In its prior memorandum, the Court addressed this issue in summary fashion, listing among various reasons for denying dismissal that "Plaintiffs include allegations under § 1106(b) regarding transactions between the Plan and the fiduciary, which are not exempted under § 1108."  (Mot. Dismiss Mem. Op., at 19.)  However, having now had the benefit of extensive briefing on the issue, the Court concludes that the § 1108(b)(8) exemption can apply to the § 1106(b) prohibitions.

To start, this interpretation is the natural reading of the statutory language.  Section 1108(b) simply states: "The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions" without making any distinction between § 1106(a) and § 1106(b).  Additionally, § 1108(b)(19) specifically provides an exemption for transactions

prohibited by § 1106(b)(2), demonstrating that Congress intended that some § 1108(b) exemptions would apply to § 1106(b).  Looking to persuasive authority, the Department of Labor ("DOL") has issued guidance that § 1108(b)(8) "will provide relief" from the § 1106(b) prohibitions, lending weight to this interpretation.  DOL Adv. Op. No. 96-15A, 1996 WL 453859, at *3 n.3 (Aug. 7, 1996); *see also* DOL Adv. Op. No. 2005-09A, 2005 WL 1208696, at *5 (May 11, 2005).  And various Courts have concurred.  *See, e.g.*, *Dupree v. Prudential Ins. Co. of Am.*, Civ. No. 99-8337, 2007 WL 2263892, at *42–43 (S.D. Fla. Aug. 7, 2007); *Pledger v. Reliance Tr. Co.*, Civ. No. MHC-15-4444, 2019 WL 10886802, at *15 (N.D. Ga. Mar. 28, 2019).

Plaintiffs nonetheless argue that § 1108(b)(8) cannot apply to § 1106(b).  Starting with the statutory language, Plaintiffs point out that the text of § 1106(a) specifically references the § 1108 exemptions, while the text of § 1106(b) does not, and argue that the implication of this formulation is that the § 1106(b) prohibitions are not subject to exemption.  (*See* Pl. Reply and Opp'n Mem. at 20–21.)  But this interpretation falters in the face of § 1108(b)(19)'s application to the § 1106(b)(2) prohibition and § 1108(a)'s application to the § 1106(b) prohibitions.  Plaintiffs also cite various cases for the proposition that § 1106(b) "admits of no exceptions." *Nat'l Sec. Systems v. Iola*, 700 F.3d 65, 94 (3d Cir. 2012).  But these cases interpret the § 1108(b)(2) and § 1108(c)(2) exemptions, which the DOL has specifically marked out as inapplicable to § 1106(b).  *See* 29 C.F.R. § 2550.408b-2.  They do not address the § 1108(b)(8) exemption, which, as noted, courts and the DOL have concluded does apply to § 1106(b).[6]

Accordingly, the Court finds that § 1108(b)(8) can apply to the § 1106(b) prohibitions.  In addition to being the more natural reading of the statutory text and in accord with the

---

[6] As Defendants note, *Santomenno v. Transamerica Life Ins. Co.*, does not actually rule on whether § 1108(b)(8) can apply to the § 1106(b) prohibitions.  316 F.R.D. 295, 307–09 (C.D. Cal. 2016), *vacated*, 883 F.3d 833 (9th Cir. 2018).  At any rate, the Court finds the aforementioned DOL advisory opinions, *Dupree*, 2007 WL 2263892, at *42–43, and *Pledger*, 2019 WL 10886802, at *15, more persuasive.

aforementioned authority, this interpretation also avoids the undesirable results of Plaintiffs'

interpretation, which would preclude fiduciaries in the Trustees' position from replacing higher-

fee mutual funds (permitted by PTE 77-3) with lower-fee CIT offerings (flatly prohibited).  Such

a rule would not further any evident policy objective and would operate to the detriment of plan

participants—as Plaintiffs have repeatedly acknowledged.  (*See, e.g.*, Second Am. Compl. ¶¶ 54–

63 (criticizing Defendants' alleged delays in replacing mutual funds with "cheaper, but otherwise

materially identical [CIT] version[s] of the same fund[s]").)

The Court next turns to the second question: whether the specific transactions challenged

by Plaintiffs can be subject to § 1108(b)(8).  Plaintiffs argue that even if § 1108(b)(8) can apply

to transactions wherein Defendants offered a particular CIT option to Plan participants, it cannot

apply to the payment of regular fees associated with investments in these CITs to the T. Rowe

Price Investment Affiliates, since those fees are not "a sale or purchase of an interest in the

fund."  (Pl. Reply and Opp'n Mem. at 21–22 (quoting § 1108(b)(8)(A)).  The issue effectively

boils down to whether: (1) each CIT fee payment should be interpreted as its own §

1108(b)(8)(A) "transaction" (as Plaintiffs argue); or (2) the § 1108(b)(8)(A) transaction is the

fiduciaries' decision to offer a T. Rowe Price fund, and subsequent fee payments are part of the

allegedly "reasonable compensation" permitted under § 1108(b)(8)(B) (as Defendants argue).

The Court adopts the latter interpretation.  As set forth in the House Conference Report

on ERISA, the purpose of the § 1108(b)(8) exemption is to enable financial institutions to

continue the "common practice" of "maintaining pooled investment funds for plans," provided

that "no more than reasonable compensation [is] paid by the plan in the purchase (or sale) and no

more than reasonable compensation [is] paid by the plan for investment management by the

pooled fund."  H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), *as reprinted in* 1974 U.S.C.C.A.N.

5038, 5096.  This formulation clearly contemplates ongoing fees "for investment management" as part of the "reasonable compensation" permitted by § 1108(b)(8)(B).  Accordingly, DOL's guidance has long reflected the understanding that "the term 'reasonable compensation' [applies] to the purchase or sale of an interest in a collective investment fund by a plan and to amounts to be paid by the plan for investment management of such assets."  DOL Adv. Op. No. 2005-09A, 2005 WL 1208696, at *5 (May 11, 2005); *see also* DOL Adv. Op. No. 82-22A, 1982 WL 21206 (May 12, 1982).[7]  Likewise, courts applying § 1108(b)(8) have analyzed "investment management fees" as allegedly "reasonable compensation."  *Dupree*, 2007 WL 2263892, at *41 (explaining an analogous § 1108(b)(8) dispute "centers on whether more than reasonable compensation was paid in the form of investment management fees").  And, as noted, reading the statute otherwise would lead to the problematic result that fiduciaries in the Trustees' position would be prevented from replacing higher-fee mutual funds with lower-fee CITs.

The Court thus turns to the third question: whether the compensation associated with the allegedly prohibited transactions was, in all cases, "reasonable" under § 1108(b)(8)(B).  Defendants argue that all their CIT fees are reasonable as a matter of law, because (1) the fees are in line with those charged by peer funds and (2) "many other retirement plans invested in the same T. Rowe Price collective trusts and paid the same fees the  Plan did."  (Def. Reply Mem. at 21–22.)  Plaintiffs respond (1) that though the relevant fees were average for actively managed proprietary funds, they were substantially higher than those charged by non-proprietary funds, and (2) that there were instances in which Defendants unreasonably delayed transitioning the Plan to the least expensive available share class or delayed transitioning from mutual funds to lower fee CITs.  (Pl. Reply and Opp'n Mem. at 26–29.)

---

[7] The Court acknowledges that, as Plaintiffs point out, these DOL advisory opinions are not binding.  But neither is the authority on which Plaintiffs rely.  The Court follows the DOL's reasoning because it is persuasive.

Defendants' evidence that their fees are typically in the bottom two quartiles for comparable investment vehicles and that many other retirement plans offer T. Rowe Price CITs is compelling.  The Court is not inclined to declare that the 401(k) industry as a whole is collectively engaging in an unreasonable practice by utilizing actively managed proprietary funds, as Plaintiffs may hope.  However, the Court is mindful that the § 1108(b)(8) exemption is an affirmative defense, and that Defendants are seeking a ruling that *all* of the CIT transactions involved no more than reasonable compensation.  Given the evidence that there were instances in which the Plan's transition to a least expensive available share class was at least somewhat delayed, (*see* Pl. Supplemental Statement of Material Fact ¶¶ 38–40, ECF No. 177-2),[8] or in which Defendants offered relatively low-performing investment vehicles that charged fees in the top quartile of peer funds (███████████████████████████████████████████████████████████████████), the Court declines to enter a global summary judgment ruling.

### 3.    *Statute of Repose*

Finally, the Court turns to the statute of repose issue.  Defendants seek a ruling regarding the application of ERISA's six-year statute of repose, 29 U.S.C. § 1113(1), to Plaintiffs' prohibited transaction claims.  Defendants argue that "[i]n a participant-directed plan like this one, the only 'transaction' attributable to the Trustees (as opposed to participants) is the initial decision to offer a fund in the Plan," and that any prohibited transaction claim related to a fund offered more than six years prior to the initiation of suit is therefore barred.  (Def. Mot. Summ. J. Mem. Supp. at 35.)  Plaintiffs rejoin that, because their challenge relates to the regular fees paid

---

[8] The Court notes that it refers here only to instances in which the Trustees were slow to transition the Plan to less expensive shares of CIT vehicles.  The instances in which the Trustees delayed transitioning from a mutual fund to a CIT are irrelevant to the § 1108(b)(8) determination, since Defendants are not arguing for the application of that exemption to the mutual fund transactions.

by Plan participants, the statute of repose begins to run anew with each such payment.  (Pl. Reply and Opp'n Mem. at 30–31.)  Notably, Defendants acknowledge that a ruling in their favor would not resolve all of Plaintiffs' prohibited transaction claims and would simply narrow the universe of transactions at issue.  (Def. Mot. Summ. J. Mem. Supp. at 35.)

The Court preliminarily addressed this issue in its motion to dismiss decision.  (*See* Mot. Dismiss Mem. Op. at 19–21.)  The Court noted the Fourth Circuit's binding ruling in *David v. Alphin*, which held that the plaintiffs' prohibited transaction claims were barred by the six-year statute of repose, since "a decision to continue certain investments, or a defendant's failure to act, cannot constitute a 'transaction' for purposes" of § 1106.  704 F.3d 327, 340 (4th Cir. 2013) (citation omitted).  However, the Court found that by alleging that the "Plan, directly or indirectly, paid millions of dollars in investment management and other fees," Plaintiffs had plausibly alleged that individual fee payments violated § 1106(a)(1)(C),(D), such that a statute of repose ruling would be premature.  (Mot. Dismiss Mem. Op. at 20–21 (emphasis in original).)

In their summary judgment briefing, each side limits their discussion of the statue of repose issue to a single paragraph, in which they restate the arguments made in their motion to dismiss briefing without discussing how facts produced in discovery should impact the analysis.  (*See* Def. Mot. Summ. J. Mem. Supp. at 35; Pl. Reply and Opp'n Mem. at 30; Def. Reply Mem. at 25.)  While *Alphin* provides strong support for Defendants' position, a more thorough examination of precisely what actions each Defendant took in relation to the fee payments at issue is necessary for the Court to make a definitive ruling as to when the statute of repose began running for each allegedly prohibited transaction.  As such, the Court will deny summary judgment, with the understanding that Defendants will have the opportunity to raise this

affirmative defense more fully.  *C.f. Baird*, 2021 WL 105619, at \*3 (denying summary judgment on the statute of repose issue).

At trial, Plaintiffs will need to identify specific transactions that run afoul of one or more of the § 1106 prohibitions.  Defendants will then have the opportunity to prove that some affirmative defense—whether PTE 77-3, the statute of repose, § 1108(b)(8), or another § 1108(b) exemption—protects them from liability for each transaction.  The above rulings of law will provide the framework in which the arguments and evidence will be considered.

### V.    *Conclusion*

For the foregoing reasons, an order shall enter: (1) denying Plaintiffs' Motion for Partial Summary Judgment (ECF No. 142); (2) granting in part and denying in part Defendants' Cross-Motion for Summary Judgment (ECF No. 147); and (3) denying Plaintiffs' Motions to Strike (ECF Nos. 180, 190).

DATED this 9th day of February, 2021.

BY THE COURT:

_____/s/_____

James K. Bredar
Chief Judge